IMAGE TECHNICAL SERVICES, INC.; J–E–S–P Company, Inc.; Shields Business Machines, Inc.; Micro–Graphic Services, Inc.; Omni Micro–Graphic Services, Inc.; Atlanta General Microfilm Co., Inc.; Datek Ltd; B.C.S. Technical Services, Inc.; CPO Ltd, Inc.; Advanced Systems Service, Inc.; Amtech Equipment Maintenance, Inc., Plaintiffs–Appellees,

v.

EASTMAN KODAK CO., Defendant–Appellant.

Nos. 96–15293, 96–15296.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 19, 1996.

Decided Aug. 26, 1997.

---

Donn P. Pickett and Daniel M. Wall, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for defendant-appellant.

Maxwell M. Blecher, Blecher & Collins, Los Angeles, CA, for plaintiffs-appellees.

Before: BEEZER and THOMPSON, Circuit Judges, GILLMOR, District Judge.*

Opinion by Judge BEEZER; Partial Concurrence and Partial Dissent by Judge GILLMOR.

BEEZER, Circuit Judge:

Plaintiffs–Appellees Image Technical Services, and ten other independent service organizations ("ISOs") that service Kodak photocopiers and micrographic equipment sued the Eastman Kodak Co. ("Kodak") for violations of the Sherman Act. The ISOs alleged that Kodak used its monopoly in the market for Kodak photocopier and micrographic parts to create a second monopoly in the equipment service markets. A jury verdict awarded treble damages totaling $71.8 million. The district court denied Kodak's post trial motions and entered a ten year permanent injunction requiring Kodak to sell "all parts" to ISOs. Kodak filed a timely appeal, challenging the jury's verdict, the ISOs' evidence, the jury instructions, the damage awards and the permanent injunction. Kodak also seeks reversal on the basis of an alleged biased juror.

This appeal raises questions relating to the application of antitrust principles upon a finding that a monopolist unilaterally refused to deal with competitors. We also address overlapping patent and copyright issues and their significance in the antitrust context.

We have jurisdiction pursuant to 28 U.S.C § 1291 and we affirm in part, reverse in part and remand with instructions to amend the injunction.

I

Kodak manufactures, sells and services high volume photocopiers and micrographic (or microfilm) equipment. Competition in these markets is strong. In the photocopier market Kodak's competitors include Xerox, IBM and Canon. Kodak's competitors in the micrographics market include Minolta, Bell & Howell and 3M. Despite comparable products in these markets, Kodak's equipment is distinctive. Although Kodak equipment may perform similar functions to that of its competitors, Kodak's parts are not interchangeable with parts used in other manufacturers' equipment.

Kodak sells and installs replacement parts for its equipment. Kodak competes with ISOs in these markets. Kodak has ready access to all parts necessary for repair services because it manufactures many of the parts used in its equipment and purchases the remaining necessary parts from independent original-equipment manufacturers. In

---

* The Honorable Helen W. Gillmor, United States District Judge for the District of Hawaii, sitting by designation.

the service market, Kodak repairs at least 80% of the machines it manufactures. ISOs began servicing Kodak equipment in the early 1980's, and have provided cheaper and better service at times, according to some customers. ISOs obtain parts for repair service from a variety of sources, including, at one time, Kodak.

As ISOs grew more competitive, Kodak began restricting access to its photocopier and micrographic parts. In 1985, Kodak stopped selling copier parts to ISOs, and in 1986, Kodak halted sales of micrographic parts to ISOs. Additionally, Kodak secured agreements from their contracted original-equipment manufacturers not to sell parts to ISOs. These parts restrictions limited the ISOs' ability to compete in the service market for Kodak machines. Competition in the service market requires that service providers have ready access to all parts.

Kodak offers annual or multi-year service contracts to its customers. Service providers generally contract with equipment owners through multi-year service contracts. ISOs claim that they were unable to provide similar contracts because they lack a reliable supply of parts. Some ISOs contend that the parts shortage forced them out of business.

In 1987, the ISOs filed this action against Kodak, seeking damages and injunctive relief for violations of the Sherman Act. The ISOs claimed that Kodak both: (1) unlawfully tied the sale of service for Kodak machines with the sale of parts in violation of § 1 of the Sherman Act, and (2) monopolized or attempted to monopolize the sale of service for Kodak machines in violation of § 2 of the Sherman Act.

Kodak moved for summary judgment prior to discovery. The district court allowed brief discovery and then granted summary judgment in Kodak's favor. *Image Technical Serv., Inc. v. Eastman Kodak Co.,* 1988 WL 156332 (N.D.Cal.). We reversed. *Image Technical Serv., Inc. v. Eastman Kodak Co.,* 903 F.2d 612 (9th Cir.1990).

Kodak appealed to the Supreme Court, which affirmed the denial of summary judgment. The Court held that the record disclosed sufficient factual disputes to survive summary judgment on both the § 1 and § 2 claims. *Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). The Supreme Court also held that Kodak's lack of market power in the market for high volume photocopiers and micrographic equipment did not preclude, as a matter of law, the possibility of market power in the derivative aftermarkets for parts and service. *Id.* at 477, 112 S.Ct. at 2087. The Court recognized that resolution of other key issues required a more complete record. The Court concluded:

> In the end, of course, Kodak's arguments may prove to be correct. It may be that its parts, service, and equipment are components of one unified market, or that the equipment market does discipline the aftermarkets so that all three are priced competitively overall, or that any anticompetitive effects of Kodak's behavior are outweighed by its competitive effects. But we cannot reach these conclusions as a matter of law on a record this sparse.

504 U.S. at 486, 112 S.Ct. at 2092.

After remand, the case proceeded to trial in the district court. Before closing arguments, the ISOs withdrew their § 1 tying and conspiracy claims. The remaining § 2 attempted monopolization and monopolization claims were submitted to the jury. A unanimous verdict awarded damages to the ISO's totaling $71.8 million after trebling.[1] Ten ISOs were awarded damages covering lost service profits in the amount of $12,172,900 (before trebling) and six ISOs were awarded damages covering lost profits for used equipment sales totaling $11,775,400 (before trebling).

After accepting the verdict, the district court crafted a ten year injunction requiring Kodak to sell all parts to ISOs on "reasonable and nondiscriminatory terms and prices." The injunction required Kodak to sell: (1) all parts for Kodak equipment; (2)

---

1. The district court excused two jurors during deliberations and thus only ten jurors deliberated on the final verdict. One juror was dismissed, over Kodak's objection, for disrupting the jury's deliberations. A second juror was dismissed by agreement of both parties and the district court.

all parts described in Kodak's Parts Lists; (3) all parts of supply items that are field replaceable by Kodak technicians; (4) all service manuals and price lists; and (5) all tools or devices "essential to servicing Kodak equipment."

## II

Section 2 of the Sherman Act prohibits monopolies, attempts to form monopolies, as well as combinations and conspiracies to do so. 15 U.S.C. § 2.[2] The ISOs presented evidence in support of two § 2 theories: attempted monopolization and monopolization. They alleged, and the jury concluded, that Kodak used its monopoly over Kodak photocopier and micrographic parts to attempt to create and actually create a second monopoly over the service markets.

To prevail on a § 2 attempt claim, the ISOs were required to establish: "(1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving 'monopoly power,' and (4) causal antitrust injury." *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.,* 51 F.3d 1421, 1434 (9th Cir.) (citing *McGlinchy v. Shell Chem. Co.,* 845 F.2d 802, 811 (9th Cir.1988)), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). The requirements of a § 2 monopolization claim are similar, differing primarily in the requisite intent and the necessary level of monopoly power. *See California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 736–37 (9th Cir. 1979). To prevail on a § 2 monopoly claim the ISOs were required to prove that Kodak: (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power. *Kodak,* 504 U.S. at 481, 112 S.Ct. at 2089–90 (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)). Section 2 plaintiffs must also establish antitrust injury. *See Cost Management Services, Inc. v. Washington Natural Gas Co.,* 99 F.3d 937, 949 (9th Cir.1996).

Kodak primarily attacks the ISOs' monopoly claim because success would likely upset the "attempt" verdict as well. We now address Kodak's appeal against the background of the Supreme Court's opinion in *Kodak* and the extensive record developed at trial.

### A. Market Power

Kodak first attacks the ISOs' monopoly power theory and its supporting evidence. Monopoly power is "the power to control prices or exclude competition." *Grinnell,* 384 U.S. at 571, 86 S.Ct. at 1704 (quoting *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)). As noted, § 2 monopoly claims require a showing of monopoly power, commonly referred to as market power. *See Cost Management Services,* 99 F.3d at 950 n. 15. Market power can be proven by either direct or circumstantial evidence. *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995). The ISOs offered proof of market power by both means. We hold that there is sufficient proof of market power by circumstantial evidence. We need not consider the ISOs' direct evidence.

To demonstrate market power by circumstantial evidence, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* at 1434 (citations omitted). We review these requirements in turn.

#### 1.

We begin with the relevant market determination. The relevant market is the field in which meaningful competition is said to exist. *See United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). Generally, the relevant market is defined in terms of product and geography. *See Rebel Oil,* 51 F.3d

---

**2.** Section 2 of the Sherman Act reads in relevant part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce ... [commits a felony]." 15 U.S.C. § 2.

at 1434; *see, e.g., Oahu Gas Service, Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 364–65 (9th Cir.1988) (all propane sales in Hawaii). In *Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* we defined "market" as the group of sellers or producers who have the "actual or potential ability to deprive each other of significant levels of business." 51 F.3d at 1434 (quoting *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989)). Without a proper definition of the relevant market, it is impossible to determine a party's influence over that market. *Id.* Ultimately what constitutes a relevant market is a factual determination for the jury. *Id.* at 1435.

■ In *Kodak,* the Supreme Court noted two guiding principles pertinent to the relevant market definition here. First, the Court held that service and parts could constitute separate markets. *Kodak,* 504 U.S. at 462–63, 481–82, 112 S.Ct. at 2079–80, 2090. Second, the Supreme Court held that a single brand could constitute a separate market. *Id.* at 482, 112 S.Ct. at 2090. Thus, as to the market for Kodak parts, the ISOs proceeded on the theory that Kodak held monopolies over two relevant parts markets: the Kodak photocopier parts market and the Kodak micrographic parts market. Both markets, the ISOs argued, consisted of the entirety of necessary Kodak parts for that field of equipment.

■ Kodak disagrees and argues that the district court erred in denying its renewed motion for judgment as a matter of law, because the ISOs' "all parts" market theory, upon which the jury relied to define the market, has no support in existing antitrust precedent. We review de novo the district court's denial of Kodak's renewed motion of judgment as a matter of law. *Acosta v. City & County of San Francisco,* 83 F.3d 1143, 1145 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 514, 136 L.Ed.2d 403 (1996). We would be required to reverse the district court's denial of Kodak's motion if the evidence, construed in the light most favorable to the ISO's, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury's. *Id.*

On appeal and in their renewed motion for judgment as a matter of law, Kodak proposes a segmented parts market. It argues that because no two parts are interchangeable, the relevant markets for parts consist of the market for each individual part for Kodak photocopiers and each single part for Kodak micrographics equipment. Under Kodak's theory there are not two relevant parts markets, but thousands of individual "part" markets. Kodak contends that the ISOs should have been required to demonstrate that they could not obtain particular nonpatented parts and that the failure to obtain that particular part resulted in a Kodak monopoly over service. We reject Kodak's market definition.

Kodak's market definition focuses exclusively on the interchangeability of the parts although ignoring the "commercial realities" faced by ISOs and end users. *Kodak,* 504 U.S. at 482, 112 S.Ct. at 2090. In *Kodak,* the Supreme Court reasoned that:

> Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines.

*Id.* The Court also recognized however, that the market definition here could "be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* (citing *Grinnell,* 384 U.S. at 572, 86 S.Ct. at 1704). Consideration of the "commercial realities" in the markets for Kodak parts compels the use of an "all parts" market theory. The "commercial reality" faced by service providers and equipment owners is that a service provider must have ready access to all parts to compete in the service market. As the relevant market for service "from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines," *id.,* the relevant market for parts from the equipment owners' and service providers' perspective is composed of "all parts" that are designed to meet Kodak photocopier and micrographics equipment specifications. The makers of these parts "if unified by a monopolist or a hypothetical cartel, would have market power in

dealing with" ISOs and end users. *Rebel Oil,* 51 F.3d at 1436 (quoting Areeda & Hovenkamp, *Antitrust Law,* ¶ 518.1b, at 534 (Supp.1993)) (defining relevant "market").

Kodak argues that service providers' need for all parts is not pertinent to the relevant market determination. Kodak, citing *In re British Oxygen Co.,* 86 F.T.C. 1241 (1975), *rev'd on other grounds, BOC Intern., Ltd. v. F.T.C.,* 557 F.2d 24 (2nd Cir.1977), analogizes to the automotive supplies market, arguing that the fact that automobile owners need tires, oil and gasoline does not mean that these elements constitute a single relevant market. The market for Kodak parts is distinguishable. First, Kodak parts, unlike tires, oil or gasoline, are not interchangeable with parts for other brands or equipment: the market for Kodak parts is a highly limited and specialized one. Second, the commercial reality for auto parts consumers does not necessitate that a retailer of tires, for example, also sell either gasoline or oil, or both. In the market for Kodak parts, a ready supply of all parts is needed to satisfy service contracts. *See, e.g., Grinnell,* 384 U.S. at 572, 86 S.Ct. at 1704 ("Central station companies recognize that to compete effectively, they must offer all or nearly all types of service."). The ISOs argue that through its anticompetitive conduct Kodak has ensured that it will possess the only inventory of all parts for Kodak high volume photocopiers and micrographic equipment.

Kodak's argument that the Supreme Court did not squarely address the relevant market issue presented here is well taken. However, nothing in the *Kodak* opinion indicates that the Court envisaged any relevant market other than "all parts." The Court analyzed three markets for photocopiers and micrographic equipment: equipment, parts and service. The Court referred to Kodak's "parts monopoly," 504 U.S. at 483, 112 S.Ct. at 2091, not its "parts monopolies," and nothing in the opinion suggests that the Court labored under the misconception that all parts *were* interchangeable.

Other factors compel our acceptance of an "all parts" market. In *Brown Shoe Co. v. United States,* the Supreme Court teaches that the boundaries of a relevant market:

> may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962) (defining "line of commerce" for the purposes of § 7 of the Clayton Act).[3] The *Brown Shoe* factors applied here, particularly the lack of consumer recognition of individual part markets, the unique and specialized nature of the equipment and the singular use of "all parts" to service Kodak equipment, weigh in favor of an "all parts" market. Kodak does not point to record evidence which supports a contrary conclusion.

The Supreme Court, relying on *Brown Shoe,* has held that groups of non-interchangeable products and services may be aggregated to form a single relevant market. *See Grinnell,* 384 U.S. at 572, 86 S.Ct. at 1704. In *United States v. Philadelphia National Bank,* for example, the Supreme Court coupled various banking services, including checking accounts, trust administration and credit functions, under the category of "commercial banking" in defining the relevant "line of commerce" under the Clayton Act. 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915 (1963). In *JBL Enterprises, Inc. v. Jhirmack Enterprises,* we likewise endorsed a relevant market defined as "the sale of beauty products" to "beauty salons and other professional outlets." 698 F.2d 1011, 1016 (9th Cir.) (quoting *JBL Enterprises, Inc. v. Jhirmack Enterprises,* 509 F.Supp. 357, 369 (N.D.Cal.1981)). In that holding, we rejected the plaintiff's efforts to define the relevant market more narrowly as relating to specific beauty products at either the wholesale or the retail level. *Id.* at 1016. We

**3.** The Supreme Court has held that its precedent relating to the "line of commerce" under § 7 of the Clayton Act applies to market definition under the "part of commerce" language in the Sherman Act. *Grinnell,* 384 U.S. at 573, 86 S.Ct. at 1705.

commented that a "cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." *Id.* at 1016–17. The market for Kodak parts is similarly amenable to this "cluster approach." Kodak service customers view service providers with the assumption that such providers will be able to obtain any part necessary to complete the needed repairs.

Kodak argues that the "cluster market" theory is inapplicable because in the market for Kodak parts no single competitor or manufacturer produces all the parts for Kodak photocopiers or micrographic equipment and thus "all parts" is not a relevant market.[4] This argument is unpersuasive. Both ISOs and Kodak inventory and sell parts to self-service customers. Even if this were not true, that all providers do not offer the same "package" or cluster of goods or services is irrelevant. In *United States v. Grinnell Corp.*, the Supreme Court held that the market for central alarm station services constituted a relevant market even though not all firms offered the same menu of alarm services. 384 U.S. at 572–73, n. 6, 86 S.Ct. at 1705 n. 6. The Supreme Court noted: "[w]e see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities." *Id.* at 572, 86 S.Ct. at 1704.

Kodak next contends, citing *United States v. AT & T*, 524 F.Supp. 1336 (D.D.C.1981), that because it makes some of the parts exclusively and does not make some parts at all, disparate market shares preclude aggregation of "all parts" for the purpose of the parts market. The district court in *AT & T*, held that:

> [i]f aggregating markets leads to the appearance of a causal link between defendants' anticompetitive conduct and their monopoly power which disappears the moment the markets are treated separately,

then clearly the aggregation would be improper.

*Id.* at 1376 (citing 3 Areeda & Turner, ¶ 627b, 84). The *AT & T* court did not preclude aggregation of the markets in question because the anticompetitive conduct at issue transcended individual products; the anticompetitive conduct at issue extended to the "whole equipment spectrum." *Id.* The district court concluded that "[i]n the interests of avoiding duplicative evidence and useless overburdening of the plaintiff" it was not necessary to require the plaintiff to prove the defendant's anticompetitive conduct in relation to "each piece of telecommunications equipment without close substitutes." *Id.* Disaggregation is also unnecessary here because Kodak either manufactures or otherwise controls a monopoly share in most of the necessary parts. *See Brown Shoe,* 370 U.S. at 327–28, 82 S.Ct. at 1525 (aggregating shares in similar submarkets because "whether considered separately or together, the picture . . . is the same.").

Aggregating the individual parts into a single "all parts" market for photocopiers and a single "all parts" market for micrographics equipment is also necessary for administrative convenience. Kodak photocopiers and micrographic equipment require thousands of individual parts and a supply of all parts is necessary in order to fulfill service contracts. To require the ISOs to prove that Kodak has monopoly power in thousands of markets would be both unduly burdensome and pointless. *See id.* at 327, 82 S.Ct. at 1525 ("Further division does not aid us . . . ."). Moreover, aggregation does not prejudice Kodak because service providers need all parts to compete in the service market, and Kodak's 100% monopoly power over the 30% of parts it manufactures suggests the same potential for control of the service market under an individual part market theory that the jury found using the "all parts" market. Kodak "can point to no ad-

---

4. Kodak also argues, citing *American Bearing Co., Inc. v. Litton Indus.,* 729 F.2d 943, 950 (3d Cir.1984), that the ISOs waived any theory regarding "cluster markets" by failing to submit a jury instruction covering this "exception" to the interchangeability requirement. In *American*

*Bearing,* the Third Circuit rejected the appellant's attempt to argue a different market theory on appeal. The ISOs do not posit a different market theory here; they continue to rely on their "all parts" theory.

vantage it would enjoy were finer divisions ... employed." *Id.*

Last, Kodak suggests that measuring market share in an "all parts" market could prove significantly over or under inclusive. Kodak argues that a firm believed to be monopolist could have a high aggregate share of the market that disguises the availability of alternative sources, or its seemingly small market share could conceal monopoly power over one crucial part. This argument, however, only demonstrates why the Supreme Court in *Kodak* emphasized the factual nature of the relevant market inquiry. 504 U.S. at 482, 112 S.Ct. at 2090. Each case is burdened with its unique facts that affect the parameters of the relevant market. Kodak has both undisputed 100% monopoly shares for certain parts and an alleged monopoly share in the entire parts market.

2.

■ Next we turn to the second monopoly power element: market share. A plaintiff relying on circumstantial evidence to establish a § 2 monopolization claim must show that the defendant owned a "dominant share" of the market. *Rebel Oil,* 51 F.3d at 1434. Calculation of the market share allows for a proper understanding of the defendant's influence and relative power in the relevant market. A dominant share of the market often carries with it the power to control output across the market, and thereby control prices. *Id.* at 1437. Courts generally require a 65% market share to establish a prima facie case of market power. *See American Tobacco Co. v. United States,* 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946).

In *Kodak,* the Supreme Court stated that Kodak's possession of monopoly power was "easily resolved." 504 U.S. at 481, 112 S.Ct. at 2089–90. The Court relied on its earlier discussion of the § 1 claim, where it held that the ISOs had "presented a triable claim that Kodak ha[d] the 'power to control prices or exclude competition' in service and parts." *Id.* Noting that "monopoly power" under § 2 requires "something greater than market power under § 1," the Court held that the "evidence that Kodak controls nearly 100% of

the parts market and 80% to 95% of the service market, with no readily available substitutes ... sufficient to survive summary judgment...." *Id.*

Kodak challenges the district court's market share instruction and the ISOs' market share evidence. Specifically, Kodak objects to the calculation of its market share by the aggregation of the percentage of parts manufactured by Kodak with the percentage of parts manufactured by original-equipment manufacturers. At trial the ISOs asserted that Kodak controls the entire parts market for its high volume photocopier and micrographics equipment by refusing to sell the parts it manufactures, 30% of the total parts needed, and by imposing restrictions on both the independent original-equipment manufacturers and end users. Kodak argues that because the ISOs withdrew their conspiracy claim they are precluded from adding the shares held by the allegedly restricted original-equipment manufacturers to Kodak's market share.

■ We need not consider Kodak's challenge to Jury Instruction No. 27, the controlling instruction, as Kodak failed to object to that instruction and thus did not preserve this argument for appeal. Failure to object to an instruction waives review. *Hammer v. Gross,* 932 F.2d 842, 847–48 (9th Cir.1991) (no plain error exception exists in civil cases in this circuit). Instruction No. 27 states in relevant part:

> Among other factors [indicative of monopoly power], you may wish to consider ... whether Kodak restricts, directly or indirectly, the ability of its supplier to sell to others....

Instruction No. 27 allows for the aggregation of Kodak's market share with the market shares of the restricted original-equipment manufacturers. Kodak also agreed to Instruction No. 26, which required the jury to find a 65% market share in order to find monopoly power.

■ We review Kodak's sufficiency of the evidence claim under the controlling instruction. We review a jury's verdict for substantial evidence. *Davis v. Mason County,* 927 F.2d 1473, 1486 (9th Cir.1991). Substantial

evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence. *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994). We hold that substantial evidence supports the jury's finding that Kodak controlled a monopoly share in the market for Kodak parts through: (1) its own manufacture of Kodak parts (30%); (2) its control of original-equipment manufacturers' sale of Kodak parts to ISOs through tooling clauses (20–25%), engineering clauses and other proprietary arrangements (exact percentage unknown); and (3) its discouragement of self-servicing and resale of parts by end users. The ISOs provided substantial evidence that the dearth and poor quality of used parts and replacement parts, not manufactured or designed by Kodak, created a shortage of available substitutes.

Kodak maintains, unpersuasively, that the ISOs failed to prove that parts were absolutely unavailable. According to Kodak, for each ISO that could not get a part, another could, and consequently, the ISO's anecdotal evidence was insufficient to demonstrate market share. The record proves otherwise. The record contains substantial evidence showing that parts were virtually unavailable for post–1986 models and often difficult to obtain for older models. Kodak itself admitted that the availability of parts was "limited." That one ISO acquired parts by buying Kodak equipment and stripping them for parts, as Kodak contends, does little to rebut Kodak's monopoly power in the parts markets. The ISOs were not required to prove that Kodak had total control over every new and used part.

■ The record also establishes the following: Alan Conklin, who supervised the acquisition of parts for Kodak's photocopier and micrographics equipment, testified that Kodak manufactured roughly 30% of its own parts. Kodak argues that other manufacturers also produced substitutes for these parts, but its reference to the record merely shows that original-equipment manufacturers could,

if Kodak chose, make almost all of Kodak's parts. Kodak also acknowledges that suppliers would not sell "proprietary" parts and Conklin testified that all parts which original-equipment manufactures produce for Kodak must meet specifications. The jury could rationally conclude that the oft-used term "proprietary" covered most if not all parts made for Kodak. ISO owners and employees testified that they could not purchase parts from independent original-equipment manufacturers. Several testified that they could not obtain any parts for post–1986 photocopiers and micrographic equipment. Kodak's argument that its tooling and engineering clauses were routine and legal is irrelevant. Legal actions, when taken by a monopolist, may give rise to liability if anticompetitive. *See Greyhound Computer v. International Business Machines,* 559 F.2d 488, 499 (9th Cir.1977).

Kodak correctly argues that the ISOs never precisely quantified Kodak's parts market shares. In his closing, counsel for the ISOs based Kodak's market share on its 30% manufacturing share, its 20% share controlled by tooling clauses and an unquantified share of production which was restricted by engineering clauses. Nonetheless, given the state of the record, a reasonable jury could conclude that Kodak had a share of the markets for photocopier and micrographic equipment parts of 65% or more. Moreover, even if the ISOs only succeeded in proving a share near 50%, this would suffice to support a jury finding of market power for the purposes of the ISOs' attempted monopolization claim. *Rebel Oil,* 51 F.3d at 1438, n. 10 (declining to adopt bright line 50% threshold for attempt). In *Rebel Oil,* we held that a 44% market share demonstrates market power "if entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Id.*

### 3.

■ The third and final monopoly power factor concerns barriers to market entry and barriers to expansion.[5] *Rebel Oil,* 51 F.3d at

---

**5.** Contrary to the ISOs' argument, the *Kodak* Court's criticism of simultaneous entry barriers to parts and service did not lessen the require-

ments for showing market power; rather, the Court's statement foreclosed Kodak's argument that prevention of ISO free-riding on its invest-

1439. A § 2 plaintiff, establishing monopoly power by circumstantial evidence, must establish more than just market share. Even a 100% monopolist may not exploit its monopoly power in a market without entry barriers. *See Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427 (9th Cir.1993) (citation omitted). A § 2 plaintiff must show that new competitors face high market barriers to entry and that current competitors lack the ability to expand their output to challenge a monopolist's high prices. *Rebel Oil*, 51 F.3d at 1439. Barriers to entry "must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting." *Id.*, 51 F.3d at 1439 (citing *United States v. Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir.1990)). Common entry barriers include: patents or other legal licenses, control of essential or superior resources, entrenched buyer preferences, high capital entry costs and economies of scale. *Id.*

Kodak argues that the ISOs failed to prove meaningful entry barriers. The record proves otherwise. Kodak has 220 patents and controls its designs and tools, brand name power and manufacturing capability. Kodak controls original-equipment manufacturers through various contract arrangements. Kodak has consistently maintained a high share of the service market. These factors together with the economies of scale, support a finding of high barriers to entry by new manufacturers and to increased output by established suppliers. *See Reazin v. Blue Cross and Blue Shield of Kansas, Inc.*, 899 F.2d 951, 968 (10th Cir.1990) ("Entry barriers may include high capital costs or regulatory or legal requirements such as patents or licenses.").

Kodak fails to rebut this evidence. Kodak focuses on the testimony of an ISO witness who stated: "[y]ou could get in my business tomorrow if you had the expertise." That witness, however, also identified capital and consumer demand as other significant barriers to market entry. Although some new entry was possible, the record reflects substantial evidence of entry barriers sufficient to prevent Kodak's monopoly share from

ment in parts justified its actions as a matter of

self-correcting. *See Rebel Oil*, 51 F.3d at 1440–41 ("Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals."). Kodak claims that the same witness testified that he could make any part if ISOs servicing a total of 2,000 machines would buy the part. The witness actually only agreed that he would "supply more Kodak parts," if there were 2,000 machines needing them. We reject Kodak's sufficiency of the evidence claim.

## B. Use of Monopoly Power

The second element of a § 2 monopoly claim, the "conduct" element, is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83, 112 S.Ct. at 2090 (quoting *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948)). The ISOs proceeded under a "monopoly leveraging" theory, alleging that Kodak used its monopoly over Kodak parts to gain or attempt to gain a monopoly over the service of Kodak equipment. The Supreme Court endorsed this theory in *Kodak* noting: "If Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2." *Id.* (citations omitted). "Willful acquisition" or "maintenance of monopoly power" involves "exclusionary conduct," not power gained "from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704.

Kodak attacks the district court's monopoly conduct jury instructions as well as the ISOs' evidence establishing Kodak's exclusionary conduct. A challenge to a jury instruction on the grounds that it misstates the relevant elements is a question of law reviewed de novo. *Caballero v. Concord*, 956 F.2d 204, 206 (9th Cir.1992). As noted, the jury's verdict will stand if supported by substantial evidence.

### 1.

Kodak's chief complaint with the monopoly power jury instructions lies with Jury

law. 504 U.S. at 485, 112 S.Ct. at 2092.

Instruction No. 29. That Instruction, entitled "Monopolization—Monopoly Conduct," states in relevant part:

> [a] company with monopoly power in a relevant market has no general duty to cooperate with its business rivals and may refuse to deal with them or with their customers if valid business reasons exist for such refusal. It is unlawful, however, for a monopolist to engage in conduct, including refusals to deal, *that unnecessarily excludes or handicaps competitors in order to maintain a monopoly.*

(emphasis added). Kodak argues that this instruction lacks objective standards and improperly includes within the prohibited activities a lawful monopolist's "aggressive" competition.

Specifically, Kodak challenges Instruction No. 29's "unnecessarily excludes or handicaps competitors" language. Kodak says that this language is based on a form of "monopoly leveraging" that we previously rejected in *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 543 (9th Cir. 1991). In *Alaska Airlines* we did reject the Second Circuit's holding in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979). *Berkey Photo* recognized liability under § 2 of the Sherman Act on a theory of monopoly leveraging involving a firm which used "its monopoly power in one market to gain a competitive advantage in another, albeit without an attempt to monopolize the second market." 603 F.2d at 275. In *Alaska Airlines,* we held that "monopoly leveraging" could not exist as a basis for § 2 liability in the absence of the defendant using its monopoly in one market to monopolize or attempt to monopolize the downstream market. 948 F.2d at 547. We characterized *Berkey Photo* 's downstream monopoly requirement—"to gain a competitive advantage"—as too "loose." *Alaska Airlines,* 948 F.2d at 546.

Kodak accuses the district court of incorporating *Berkey Photo* 's repudiated language into the court's instructions. We disagree. Instruction No. 29 required the jury to find that Kodak's monopoly conduct be undertaken "in order to maintain a monopoly" in the downstream market. *Berkey Pho-*

*to* 's watered-down standard does not go this far. Instruction No. 29 makes clear that the monopolies at issue are Kodak's alleged service monopolies and the Instruction required the jury to find that Kodak acted in furtherance of maintaining its service monopolies. Instruction No. 29's "unnecessarily excludes or handicaps competitors" language does not come from *Berkey Photo,* but from the jury instruction endorsed by the Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 597, 611, 105 S.Ct. 2847, 2854–55, 2861–62, 86 L.Ed.2d 467 (1985).

### 2.

 Kodak also objects to the attempted monopolization and monopolization jury instructions on the grounds that they fail to describe adequately the "essential facilities" doctrine, which Kodak contends is the controlling law in unilateral refusal to deal cases. Kodak asserts that this doctrine is the sole legal theory which could require Kodak to sell "all parts." Kodak argues that the essential facilities doctrine required the jury to find that Kodak's parts monopoly carries "the power to eliminate competition."

Kodak's challenge raises a novel issue: whether a monopolist is liable under § 2 of the Sherman Act for an anticompetitive refusal to deal only under an "essential facilities" theory, that is, only when the refusal involves something "essential" to the survival of competitors. As noted, Kodak would answer affirmatively; we reject this theory. Instead, relying on *Kodak* and *Aspen Skiing,* we endorse the ISOs' theory that § 2 of the Sherman Act prohibits a monopolist from refusing to deal in order to create or maintain a monopoly absent a legitimate business justification. We need not apply the essential facilities doctrine.

Section 2 of the Sherman Act prohibits a monopolist's unilateral action, like Kodak's refusal to deal, if that conduct harms the competitive process in the absence of a legitimate business justification. *See Kodak,* 504 U.S. at 483 n. 32, 112 S.Ct. at 2090 n. 32 (citing *Aspen Skiing,* 472 U.S. at 602, 105 S.Ct. at 2857). Unilateral refusals to deal often concern an "essential" facility. *See*

*Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). In *Alaska Airlines,* we defined the essential facilities doctrine, generally, as: imposing "liability when one firm, which controls an essential facility, denies a second firm reasonable access to a product or service that the second firm must obtain to compete with the first." 948 F.2d at 542. A facility is "essential" if it is otherwise unavailable and cannot be "reasonably or practically duplicated." *Anaheim v. Southern California Edison Co.,* 955 F.2d 1373, 1380 (9th Cir.1992).

In *Otter Tail Power Co. v. United States,* the Supreme Court held that the defendant, Otter Tail Power, used its electrical utility equipment, an "essential facility," to gain monopoly power over all commercial electrical services. 410 U.S. at 377–79, 93 S.Ct. at 1029–30. Otter Tail Power generally sold both wholesale and retail electrical services. Later it refused to provide only wholesale electrical services to several municipalities which intended to supply retail electrical services to the ultimate customers. The Court held that Otter Tail Power's refusal to supply "only wholesale" services eliminated competition in the downstream market for retail services as Otter Tail Power owned the only "facility" capable of supplying these services. The Court held that such "exclusionary" conduct violated § 2 of the Sherman Act. *Id.*

In *Alaska Airlines,* we interpreted *Otter Tail* as requiring plaintiffs proceeding under the "essential facilities" doctrine to establish that the controlled facility "carries with it the power to eliminate competition in the downstream market." 948 F.2d at 544; *see, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 569 (2d Cir.1990) ("A successful 'essential facilities' plaintiff must prove that denial of access has caused it 'severe handicap' [in the market]."). Kodak faults the district court for failing to instruct the jury that to be liable under § 2, Kodak's exclusionary conduct must have "eliminated competition" in the downstream service market.

The Supreme Court has never explicitly held that a § 2 refusal to deal claim can only be established under the "essential facilities"

rubric. In *Kodak* the Supreme Court never discussed the essential facilities doctrine; nor do any of the cases cited by the Court employ the essential facilities analysis. *See* 504 U.S. at 483, 112 S.Ct. at 2090–91 (citing *Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *United States v. Aluminum Co. of America,* 148 F.2d 416, 432 (2d Cir.1945), and *Aspen Skiing,* 472 U.S. at 600–605, 105 S.Ct. at 2856–59). Rather in discussing a firm's right to "refuse to deal with its competitors," the Supreme Court noted, citing *Aspen Skiing,* that this right "exists only if there are legitimate competitive reasons for the refusal." *Kodak,* 504 U.S. at 483 n. 32, 112 S.Ct. at 2091 n. 32.

The Supreme Court considered a refusal to deal claim in *Aspen Skiing* without referencing the essential facilities doctrine. *Aspen Skiing* involved a § 2 challenge by one Aspen ski resort against the owner of the remaining three ski resorts in Aspen, a monopolist in the recreational ski market. The plaintiff proceeded under an essential facilities theory alleging that a previously available "all-Aspen" ski pass, granting the holder access to all four Aspen ski areas, was an essential facility. The jury agreed and awarded damages. The Tenth Circuit affirmed. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,* 738 F.2d 1509, 1517–23 (10th Cir.1984). The Supreme Court also affirmed, but did not rely on the "essential facilities" doctrine. *Aspen Skiing,* 472 U.S. at 611 n. 44, 105 S.Ct. at 2862 n. 44 ("Given our conclusion that the evidence amply supports the verdict under the instructions as given by the trial court, we find it unnecessary to consider the possible relevance of the 'essential facilities' doctrine . . . .").

The Supreme Court began its analysis in *Aspen Skiing* with a discussion of the "right to refuse to deal," a right the Court characterized as highly valued but not "unqualified." *Id.* at 601, 105 S.Ct. at 2856. The Court, quoting extensively from *Lorain Journal Co. v. United States,* 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951), held that the right to refuse to deal was "neither absolute nor exempt from regulation" and when used "as a purposeful means of monopolizing interstate commerce" the ex-

ercise of that right violates the Sherman Act. *Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. at 2857. Thus "the long recognized right ... [to] freely [ ] exercise [one's] own independent discretion as to parties with whom he will deal" does not violate the Sherman Act *"[i]n the absence of any purpose to create or maintain a monopoly." Id.* (quoting *Lorain Journal* 342 U.S. at 155, 72 S.Ct. at 187) (emphasis in the original) (citations omitted). In *Aspen Skiing* the Court noted that a defendant's refusal to deal was evidence of its' intent "relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive'—to use the words in the trial court's instructions—or 'predatory,' to use a word that scholars seem to favor." *Id.*

Next, the Court reasoned that a monopolist's refusal to deal was not limited to the specific facts of *Lorain Journal*, but also covered the *Aspen Skiing* defendant-monopolist's election "to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years." *Id.* at 603, 105 S.Ct. at 2858. The Court noted that competitors in other markets continued to use interchangeable lift tickets and thus inferred that "such tickets satisfy consumer demand in free competitive markets." *Id.* The Court concluded that although such conduct was not "necessarily anticompetitive," the posture of the case and the strength of the evidence presented compelled the Court to uphold the jury's finding of liability. The Court noted that the challenged instructions correctly required the jury to distinguish "between practices which tend to exclude or restrict competition on the one hand, and the success of a business which reflects only a superior product, a well-run business, or luck, on the other." *Id.* Other instructions properly informed the jury that the defendant's refusal to deal "does not violate Section 2 if valid business reasons exist for that refusal." *Id.* at 605, 105 S.Ct. at 2858. By ignoring the

essential facilities doctrine in *Aspen Skiing*, the Supreme Court endorsed the application of traditional § 2 principles to unilateral refusal to deal cases.

Jury Instructions Nos. 28 and 29 here covered the requirements set forth in *Aspen Skiing*.[6] Like the Supreme Court in *Aspen Skiing*, we are faced with a situation in which a monopolist made a conscious choice to change an established pattern of distribution to the detriment of competitors. *Id.* at 603, 105 S.Ct. at 2858. Although the service market prior to Kodak's parts policy had not "originated in a competitive market and persisted for several years," *id.*, the ISO service market had existed for three years and was growing rapidly before Kodak implemented its parts policy. Our case is factually distinguishable from *Aspen Skiing* in several respects: here there are no readily comparable competitive markets; ISO profits were not halved after the imposition of the anticompetitive policies; and there are two markets at issue, rather than only one. Further, unlike most essential facilities cases and this case, *Aspen Skiing* did not involve the effects of a supplier's refusal to deal with its customers in order to control a downstream market. Notwithstanding these distinctions, both the analysis in *Aspen Skiing* and *Kodak* footnote 32 suggest that *Aspen Skiing* applies here. Like the First Circuit in *Data General v. Grumman Systems Support*, 36 F.3d 1147 (1st Cir.1994), we believe the Supreme Court, in *Aspen Skiing*, endorsed a more general application of § 2 principles to refusal to deal cases. *See Data General*, 36 F.3d at 1183–84 (plaintiff alleging § 2 refusal to deal claim "need not tailor its argument to a preexisting 'category' of unilateral refusals to deal."). The district court's Jury Instruction No. 29 was proper.

3.

 Kodak next attacks the jury's verdict on the grounds that the ISOs failed to present a theory of aftermarket monopoly

6. Jury Instruction No. 28 states in relevant part: Exclusionary conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs the efforts of others to compete for customers in an unnecessarily restrictive way. Such conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

that makes economic sense as required by *Kodak.* Kodak contends that at trial the ISOs dropped the economic theory they advanced before the Supreme Court, and under their new theory they failed to prove that the equipment market does not discipline the aftermarkets in such a way as to prevent monopoly power.

■■■ We review Kodak's claim only for plain error because Kodak failed to move for judgment as a matter of law under Federal Rule of Civil Procedure Rule 50(a) at the close of the evidence. *Cabrales v. County of Los Angeles,* 864 F.2d 1454, 1459 (9th Cir. 1988), *vacated on other grounds,* 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989). We strictly adhere to the requirements of Rule 50(b), which prohibit a party from moving for a judgment as a matter of law after the jury's verdict unless that motion was first presented at the close of evidence. *Sloman v. Tadlock,* 21 F.3d 1462, 1473 (9th Cir.1994).

Kodak, relying on out-of-circuit authority, argues that a party need not move for judgment as a matter of law when such a motion would be futile. *See Pittsburgh–Des Moines Steel Co. v. Brookhaven Manor Water Co.,* 532 F.2d 572, 577 (7th Cir.1976); *Albrecht v. Herald Co.,* 452 F.2d 124, 127 (8th Cir.1971). We have explicitly rejected the Seventh Circuit's subjective approach to Rule 50. *Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1346 n. 2 (9th Cir.1985). Further, the district court's denial of Kodak's motion for summary judgment on this issue did not render a Rule 50(a) motion futile because, as Kodak repeatedly argues, the ISOs did not present the same evidence at trial that both the Supreme Court and district court considered at summary judgment.

The record discloses that the ISOs presented sufficient evidence to establish Kodak's monopoly power in the service market. Under the plain error standard we inquire no further. We reverse under plain error only if "there is an absolute absence of evidence to support the jury's verdict." *Cabrales,* 864 F.2d at 1459. The record reflects the following: Kodak has a 95% share of the Kodak high volume photocopier service market and an 88% share of the Kodak micrographic

service market. Several ISOs withdrew from the Kodak service market or substantially restricted their service due to the lack of available parts, although other ISOs made substantial profits and continued to grow steadily. Some ISOs could not obtain any parts for newer models, indicating that the current ISO service market may last only as long as the pre–1986 models survive. Kodak equipment customers experienced the "lock-in" and information imperfections as described in *Kodak,* 504 U.S. at 477, 112 S.Ct. at 2087–88 ("there is a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another."). Kodak's market share in the equipment market further limits choices by consumers. Finally, although Kodak criticizes their methodology, the ISOs presented evidence that Kodak earns supracompetitive profits in service, and overall. Substantial evidence supports the jury's verdict on the issue of Kodak's service market monopoly.

### III

■■■ Our conclusion that the ISOs have shown that Kodak has both attained monopoly power and exercised exclusionary conduct does not end our inquiry. Kodak's conduct may ·not be actionable if supported by a legitimate business justification. When a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act. *See Kodak,* 504 U.S. at 483, 112 S.Ct. at 2090–91; *Oahu Gas,* 838 F.2d at 368. A plaintiff may rebut an asserted business justification by demonstrating either that the justification does not legitimately promote competition or that the justification is pretextual. *See Kodak,* 504 U.S. at 483–84, 112 S.Ct. at 2090–91 (citing *Kodak,* 903 F.2d at 618). Kodak asserts that the protection of its patented and copyrighted parts is a valid business justification for its anticompetitive conduct and argues that the district court's erroneous jury instructions made it impossible for the jury to properly consider this justification. Kodak attacks the district court's failure both to ·provide a "less restric-

tive alternatives" instruction, and to instruct as to Kodak's intellectual property rights. Jury instructions "must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Knapp v. Ernst & Whinney,* 90 F.3d 1431, 1437 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 952, 136 L.Ed.2d 839 (1997). To the extent that Kodak alleges error in the district court's formulation of the instructions, we consider the instructions as a whole and apply an abuse of discretion standard to determine if they are "misleading or inadequate." *Id.* (citation omitted). To the extent that Kodak argues that the district court misstated the elements the ISOs were required to prove at trial, we review the instructions de novo. *Id.*

## A. Least Restrictive Alternatives

■ Kodak argues that the district court erred by failing to instruct the jury that it was not to consider whether Kodak could have accomplished its business objectives through less restrictive alternatives. Kodak also questions the sufficiency of the ISOs' pretext evidence. The ISOs counter that Kodak waived its arguments regarding business justifications by failing to move for judgment as a matter of law. We disagree. To the extent that Kodak's arguments focus on the jury instructions and not the general sufficiency of the evidence, Rule 50(b) does not apply.

■ Kodak argues that monopolization, unlike tying, does not require consideration of whether the defendant could have achieved its aims through less restrictive alternatives. Kodak, however, cites no authority mandating an instruction requiring that the jury not consider "less restrictive alternatives." Kodak's argument rests on the combination of the district court's refusal to use Kodak's requested language and Kodak's disagreement with the "unnecessarily excludes or handicaps competitors" language of Jury Instruction Nos. 29 and 34. As a result of this combination, Kodak argues, the ISOs were able to argue a "necessity" standard and ask the jury to weight what Kodak did "against the alternatives."

As discussed above, the "unnecessarily excluded or handicaps" language was permissible under *Aspen Skiing.* Moreover, the district court's instruction here, Instruction No. 28, was very similar to both the language proposed by Kodak and the language endorsed by the Supreme Court in *Aspen Skiing,* 472 U.S. at 597, 105 S.Ct. at 2854–55. Jury Instruction No. 28 defines "exclusionary conduct" as impairing "the efforts of others to compete for customers in an unnecessarily restrictive way." The district court also instructed that: (1) Kodak could refuse to deal if valid business reasons existed and (2) the jury could not "second guess whether Kodak's business judgment was wise or correct in retrospect." Under these instructions the jury could not consider "less restrictive alternatives" without "second guessing" Kodak and thus violating the jury instructions. We presume that the jury followed the court's instructions. *United States v. Alston,* 974 F.2d 1206, 1210 (9th Cir.1992).

Kodak next argues that the ISOs' primary arguments refuting Kodak's business justifications were "less restrictive alternative" arguments. Kodak focuses on the ISOs' attack on Kodak's quality control justification as one such "less restrictive alternative" argument. Kodak argues that because "the legitimacy of quality control is beyond reproach," the ISOs were forced to establish this justification, and others, were pretextual. The ISOs did establish pretext: they attacked Kodak's quality control justification on the grounds that it was pretextual, not because it was the least restrictive alternative. Counsel for the ISOs argued that Kodak's quality control justification was "a joke" because ISOs do not interfere with the quality of Kodak's service. We hold that the district court did not err in its instructions.

■ Kodak has waived its insufficiency of evidence claim on this issue by failing to move for judgment as a matter of law at trial. We review only for plain error. *Cabrales,* 864 F.2d at 1459. The ISOs' evidence suffices to support the jury's rejection of Kodak's business justifications, as the record reflects evidence of pretext. The ISOs presented evidence that: (1) Kodak adopted its parts policy only after an ISO won a contract

with the State of California; (2) Kodak allowed its own customers to service their machines; (3) Kodak customers could distinguish breakdowns due to poor service from breakdowns due to parts; and (4) many customers preferred ISO service.

## B. Intellectual Property Rights

Kodak also attacks the district court's business justifications instructions for their failure to properly detail Kodak's intellectual property rights. Kodak argues that the court failed to instruct the jury that Kodak's numerous patents and copyrights provide a legitimate business justification for Kodak's alleged exclusionary conduct. Kodak holds 220 valid United States patents covering 65 parts for its high volume photocopiers and micrographics equipment, and all Kodak diagnostic software and service software are copyrighted. The jury instructions do not afford Kodak any "rights" or "privileges" based on its patents and copyrights: all parts are treated the same. In Jury Instruction No. 37, the court told the jury:

[i]f you find that Kodak engaged in monopolization or attempted monopolization by misuse of its alleged parts monopoly ... then the fact that some of the replacement parts are patented or copyrighted does not provide Kodak with a defense against any of those antitrust claims.

In Jury Instruction No. 28, the court stated, over Kodak's objection, that:

[s]uch [exclusionary] conduct does not refer to ordinary means of competition, like offering better products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages.

Kodak proposed to include "exercising lawful patents and copyrights" amongst the list of non-exclusionary conduct in Instruction No. 28, but the district court rejected that language.

Kodak's challenge raises unresolved questions concerning the relationship between federal antitrust, copyright and patent laws. In particular we must determine the significance of a monopolist's unilateral refusal to sell or license a patented or copyrighted product in the context of a § 2 monopolization claim based upon monopoly leveraging. This is a question of first impression.

### 1.

We first identify the general principles of antitrust, copyright and patent law as we must ultimately harmonize these statutory schemes in responding to Kodak's challenge.

Antitrust law seeks to promote and protect a competitive marketplace for the benefit of the public. *See Standard Oil Co. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911); *SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1203 (2d Cir.1981). The Sherman Act, the relevant antitrust law here, prohibits efforts both to restrain trade by combination or conspiracy and the acquisition or maintenance of a monopoly by exclusionary conduct. 15 U.S.C. §§ 1, 2.

Patent law seeks to protect inventions, while inducing their introduction into the market for public benefit. *SCM Corp.,* 645 F.2d at 1203. Patent laws "reward the inventor with the power to exclude others from making, using or selling [a patented] invention throughout the United States." *Id.*[7] Meanwhile, the public benefits both from the

7. In 1988, Congress amended the patent laws to provide that "[n]o patent owner otherwise entitled to relief for infringement ... of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of ... (4) [the patent owner's] refus[al] to license or use any rights to the patent." 35 U.S.C. § 271(d) (1988).

The First Circuit has observed that this amendment "may even herald the prohibition of all antitrust claims ... premised on a refusal to license a patent." *Data General,* 36 F.3d at 1187 (citing Richard Calkins, "Patent Law: The Impact of the 1988 Patent Misuse Reform Act

and Noerr–Pennington Doctrine on Misuse Defenses and Antitrust Counterclaims," 38 Drake L.Rev. 175, 192–97 (1988–89)). The amended statutory language does not compel this result, and Calkins and other commentators agree that § 271(d)(4) merely codified existing law. *See* Calkins, 38 Drake L.Rev. at 197; 5 Donald S. Chisum, *Patents,* § 19.04[1] at 19–295 (1992) ("The 'refusal to license' provision received little attention in the floor statements, primarily because the provision was intended to codify existing law."). The amendment does, however, indicate congressional intent to protect the core patent right of exclusion.

faster introduction of inventions, and the resulting increase in market competition. Legally, a patent amounts to a permissible monopoly over the protected work. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969). Patent laws "are in *pari materia* with the antitrust laws and modify them *pro tanto* (as far as the patent laws go)." *Simpson v. Union Oil Co.*, 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed.2d 98 (1964).

Federal copyright law "secure[s] a fair return for an author's creative labor" in the short run, while ultimately seeking "to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040, 2044, 45 L.Ed.2d 84 (1975) (internal quotations omitted). The Copyright Act grants to the copyright owner the exclusive right to distribute the protected work. 17 U.S.C. § 106. This right encompasses the right to "refrain from vending or licensing," as the owner may "content [itself] with simply exercising the right to exclude others from using [its] property." *Data General*, 36 F.3d at 1186 (quoting *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010 (1932)); *see Stewart v. Abend*, 495 U.S. 207, 228–29, 110 S.Ct. 1750, 1764, 109 L.Ed.2d 184 (1990)("nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright.")

Clearly the antitrust, copyright and patent laws both overlap and, in certain situations, seem to conflict. This is not a new revelation. We have previously noted the "obvious tension" between the patent and antitrust laws: "[o]ne body of law creates and protects monopoly power while the other seeks to proscribe it." *United States v. Westinghouse Electric Corp.*, 648 F.2d 642, 646 (9th Cir. 1981) (citations omitted). Similarly, tension exists between the antitrust and copyright laws. *See Data General*, 36 F.3d at 1187.

Two principles have emerged regarding the interplay between these laws: (1) neither patent nor copyright holders are immune from antitrust liability, and (2) patent and copyright holders may refuse to sell or license protected work. First, as to antitrust liability, case law supports the proposition that a holder of a patent or copyright violates the antitrust laws by "concerted and contractual behavior that threatens competition." *Id.* at 1185 n. 63 (citation omitted). In *Kodak*, the Supreme Court noted:

> [we have] held many times that power gained through some natural advantage such as a patent, copyright, or business acumen can give rise to liability if 'a seller exploits his dominant position in one market to expand his empire into the next.'

504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29 (quoting *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 611, 73 S.Ct. 872, 882, 97 L.Ed. 1277 (1953) and citing *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); *Leitch Mfg. Co. v. Barber Co.*, 302 U.S. 458, 463, 58 S.Ct. 288, 290–91, 82 L.Ed. 371 (1938)).

Case law also supports the right of a patent or copyright holder to refuse to sell or license protected work. *See Westinghouse*, 648 F.2d at 647. In *United States v. Westinghouse Electric Corp.*, we held that "[t]he right to license [a] patent, exclusively or otherwise, or to refuse to license at all, is the 'untrammeled right' of the patentee." *Id.* (quoting *Cataphote Corporation v. DeSoto Chemical Coatings, Inc.*, 450 F.2d 769, 774 (9th Cir.1971)); *see Zenith Radio Corp.*, 395 U.S. at 135, 89 S.Ct. at 1583 (the patent holder has the "right to invoke the State's power to prevent others from utilizing [the] discovery without [the patent holder's] consent") (citations omitted); *Tricom Inc. v. Electronic Data Systems Corp.*, 902 F.Supp. 741, 743 (E.D.Mich.1995) ("Under patent and copyright law, [the owner] may not be compelled to license ... to anyone.") (citations omitted).

2.

Next we lay out the problem presented here. The Supreme Court touched on this question in *Kodak*, i.e., the effect to be given a monopolist's unilateral refusal to sell or license a patented or copyrighted product in the context of a § 2 monopoly leveraging claim. In footnote 29, previously discussed,

the Supreme Court in *Kodak* refutes the argument that the possession by a manufacturer of "inherent power" in the market for its parts "should immunize [that manufacturer] from the antitrust laws in another market." 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29. The Court stated that a monopolist who acquires a dominant position in one market through patents and copyrights may violate § 2 if the monopolist exploits that dominant position to enhance a monopoly in another market. Although footnote 29 appears in the Court's discussion of the § 1 tying claim, the § 2 discussion frequently refers back to the § 1 discussion, and the Court's statement that "exploit[ing][a] dominant position in one market to expand [the] empire into the next" is broad enough to cover monopoly leveraging under § 2. *Id.*[8] By responding in this fashion, the Court in *Kodak* supposed that intellectual property rights do not confer an absolute immunity from antitrust claims.

The *Kodak* Court, however, did not specifically address the question of antitrust liability based upon a unilateral refusal to deal in a patented or copyrighted product. Kodak and its amicus correctly indicate that the right of exclusive dealing is reserved from antitrust liability. We find no reported case in which a court has imposed antitrust liability for a unilateral refusal to sell or license a patent or copyright.[9] Courts do not generally view a

monopolist's unilateral refusal to license a patent as "exclusionary conduct." *See Data General*, 36 F.3d at 1186 (citing *Miller Insituform, Inc. v. Insituform of North America*, 830 F.2d 606, 609 (6th Cir.1987)) ("A patent holder who lawfully acquires a patent cannot be held liable under Section 2 of the Sherman Act for maintaining the monopoly power he lawfully acquired by refusing to license the patent to others."); *Westinghouse*, 648 F.2d at 647 (finding no antitrust violation because "Westinghouse has done no more than to license some of its patents and refuse to license others"); *SCM Corp.*, 645 F.2d at 1206 ("where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws.").

■ This basic right of exclusion does have limits. For example, a patent offers no protection if it was unlawfully acquired. *Data General*, 36 F.3d at 1186 (citing *SCM Corp.*, 645 F.2d at 1208–09). Nor does the right of exclusion protect an attempt to extend a lawful monopoly beyond the grant of a patent. *See Mercoid*, 320 U.S. at 665, 64 S.Ct. at 271. Section 2 of the Sherman Act condemns exclusionary conduct that extends natural monopolies into separate markets. Much depends, therefore, on the definition of the patent grant and the relevant market.

The relevant market for determining the patent or copyright grant is determined un-

8. The cases cited by the Supreme Court also support this conclusion. In *Times–Picayune*, the Court addressed both a § 1 tying claim and a § 2 monopolization claim. 345 U.S. at 611, 73 S.Ct. at 881–82. Regarding the § 1 claim, the Court found insufficient power in the relevant market to support "dominance." *Id.* Later in addressing the § 2 claim, the Supreme Court held that "[t]his case does not demonstrate an attempt by a monopolist established in one area to nose into a second market...." *Id.* at 626, 73 S.Ct. at 890.

Also relevant to the relationship between § 1 and § 2, the Court in *Leitch Manufacturing* held that it made no difference that the defendant had not expanded its monopoly "by contract." 302 U.S. at 463, 58 S.Ct. at 291. The Court held:
[T]he owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material .... [This is unlawful] whatever the nature of the device by which the owner of the patent

seeks to effect such unauthorized extension of the monopoly.
*Id.* (citation omitted); *see also Mercoid Corp. v. Mid–Continent Investment Co.*, 320 U.S. 661, 665, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1943) ("The method by which the monopoly is sought to be extended is immaterial.")

The particular patent misuse issues addressed in *Leitch* and *Mercoid* are now controlled by 35 U.S.C. § 271, *Dawson Chem. Co. v. Rohm & Haas*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980), but this does not alter the application of their reasoning here.

9. The ISOs correctly observe that this case involves a selective refusal to sell products protected by patents and copyrights, not an absolute refusal to license. This distinction makes no difference. *See Westinghouse*, 648 F.2d at 647 ("the right to license ... exclusively or otherwise ... is the 'untrammeled right' of the patentee."). The ISOs offer no rationale for a distinction between discriminatory licensing and discriminatory sales.

der patent or copyright law. *See, e.g., id.* at 666, 64 S.Ct. at 271 (the patent's grant "is limited to the invention which it defines."). The relevant markets for antitrust purposes are determined by examining economic conditions. *See Kodak,* 504 U.S. at 462, 112 S.Ct. at 2079–80 (citing *Jefferson Parish Hospital Dist. No. 2. v. Hyde,* 466 U.S. 2, 21–22, 104 S.Ct. 1551, 1563–64, 80 L.Ed.2d 2 (1984)). We recently noted the distinction between copyright market definition and antitrust market definition in *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330 (9th Cir.1995). There, the plaintiff, Southeastern, argued that the copyright of the defendant, Triad, did not "extend to the service market" for Triad computers. We disagreed stating:

> Triad invented, developed, and marketed its software to enable its customers and its own technicians to service Triad computers. Southeastern is getting a free ride when it uses that software to perform precisely the same service. Triad is entitled to licensing fees from Southeastern and other ISOs....

*Id.* at 1337. Rather than merely requiring Southeastern to pay for future use, the district court enjoined Southeastern from servicing the computers that had licensed software. *See id.* at 1334. We never reached Southeastern's antitrust counterclaims, as they had not yet been tried. *Id.* at 1338 (district court properly bifurcated the copyright and antitrust claims). Neither did we refer to antitrust principles in defining the reach of Triad's copyright.

Parts and service here have been proven separate markets in the antitrust context, but this does not resolve the question whether the service market falls "reasonably within the patent [or copyright] grant" for the purpose of determining the extent of the exclusive rights conveyed. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 708–09 (Fed. Cir.1992). These are separate questions, which may result in contrary answers. At the border of intellectual property monopolies and antitrust markets lies a field of

dissonance yet to be harmonized by statute or the Supreme Court.

When an owner of intellectual property takes concerted action in violation of § 1, this dissonance does not threaten his core right of exclusion.[10] *See Brownell v. Ketcham Wire & Manufacturing Co.,* 211 F.2d 121, 129 (9th Cir.1954) (listing acts giving rise to antitrust liability). Contrary to the ISOs' arguments, there is an important difference between § 1 tying and § 2 monopoly leveraging: the limiting principles of § 1 restrain those claims from making the impact on intellectual property rights threatened by § 2 monopoly leveraging claims. Where, as here, the claim involves a failure to act that is at the heart of the property right, liability depends largely on market definition and lacks the limiting principles of § 1. Under § 2, "[b]ehavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Kodak,* 504 U.S. at 488, 112 S.Ct. at 2093 (Scalia, J. dissenting) (citing 3 Areeda & Turner, ¶ 813, at 300–302); *see also Greyhound Computer v. International Business Machines,* 559 F.2d 488, 498 (9th Cir.1977) (otherwise lawful conduct may be exclusionary when practiced by a monopolist). Harmonizing antitrust monopoly theory with the monopolies granted by intellectual property law requires that some weight be given to the intellectual property rights of the monopolist.

The effect of claims based upon unilateral conduct on the value of intellectual property rights is a cause for serious concern. Unilateral conduct is the most common conduct in the economy. After *Kodak,* unilateral conduct by a manufacturer in its own aftermarkets may give rise to liability and, in one-brand markets, monopoly power created by patents and copyrights will frequently be found. Under current law the defense of monopolization claims will rest largely on the legitimacy of the asserted business justifica-

10. The ISOs withdrew their tying claim. The ISOs' Amici, National Electronics Service Dealers Association and Professional Service Association, argue that the record reflects concerted action by Kodak, but the jury instructions do not define such action and we should not presume that it was found.

tions, as evidenced by the jury instructions approved in *Aspen Skiing.*

Without bounds, claims based on unilateral conduct will proliferate. The history of this case demonstrates that such claims rest on highly disputed factual questions regarding market definition. Particularly where treble damages are possible, such claims will detract from the advantages lawfully granted to the holders of patents or copyrights by subjecting them to the cost and risk of lawsuits based upon the effect, on an arguably separate market, of their refusal to sell or license. The cost of such suits will reduce a patent holder's "incentive ... to risk the often enormous costs in terms of time, research, and development." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 480, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974). Such an effect on patent and copyright holders is contrary to the fundamental and complementary purposes of both the intellectual property and antitrust laws, which aim to "encourag[e] innovation, industry and competition." *Atari Games Corp. v. Nintendo of America, Inc.,* 897 F.2d 1572, 1576 (Fed.Cir.1990) (citing *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 876–77, (Fed.Cir.1985)).[11]

### 3.

■ We now resolve the question detailed above. Under the fact-based approaches of *Aspen Skiing* and *Kodak,* some measure must guarantee that the jury account for the procompetitive effects and statutory rights extended by the intellectual property laws. To assure such consideration, we adopt a modified version of the rebuttable presumption created by the First Circuit in *Data General,* and hold that "while exclusionary conduct can include a monopolist's unilateral refusal to license a [patent or] copyright," or to sell its patented or copyrighted work, a monopolist's "desire to exclude others from its [protected] work is a presumptively valid business justification for any immediate harm to consumers." *Data General,* 36 F.3d at 1187.

11. That antitrust claims may cut into the core rights conferred by patents and copyrights is illustrated by the injunction imposed by the district court here. The injunction requires that Kodak supply all ISOs with its patented and

This presumption does not "rest on formalistic distinctions" which "are generally disfavored in antitrust laws;" rather it is based on "actual market realities." *Kodak,* 504 U.S. at 466–67, 112 S.Ct. at 2082. This presumption harmonizes the goals of the relevant statutes and takes into account the long term effects of regulation on these purposes. The presumption should act to focus the factfinder on the primary interest of both intellectual property and antitrust laws: public interest. *Mercoid,* 320 U.S. at 665, 64 S.Ct. at 271 (citation omitted) ("It is the public interest which is dominant in the patent system."); *Standard Oil,* 221 U.S. at 58, 31 S.Ct. at 515 (antitrust laws serve the public interest by encouraging effective competition).

■ Given this presumption, the district court's failure to give any weight to Kodak's intellectual property rights in the jury instructions constitutes an abuse of discretion. This error was, however, harmless. The ISOs maintain that Kodak argued protection of intellectual property as a business justification to the jury, which rejected this justification as pretextual. An error in instructing the jury in a civil case does not require reversal if it is more probable than not harmless. *Jenkins v. Union Pacific R. Co.,* 22 F.3d 206, 210 (9th Cir.1994).

Kodak contends that the district court's jury instructions prevented it from arguing intellectual property to the jury. Although Kodak listed "Protect[ ] Kodak's R & D investment and intellectual property rights" among the seven business justifications it presented, the only argument Kodak made in closing was this:

> Protecting Investments. By itself, again, another legitimate business reason. You've already seen the size of the investments. And indeed, Plaintiffs themselves recognized that they wouldn't be in business unless Kodak made those investments.

copyrighted materials at "reasonable prices." Even the ISOs do not dispute that Kodak is entitled to reap monopoly prices from the sale or licensing of these materials.

Phrased in these broad terms, Kodak's argument repeats the "free-riding" justification rejected, as a matter of law, by the Supreme Court. *Kodak,* 504 U.S. at 485, 112 S.Ct. at 2092. The Supreme Court held that preventing the ISOs from "exploit[ing] the investment Kodak has made in product development, manufacturing and equipment sales" does not suffice as a business justification. *Id.* ("This understanding of free-riding has no support in our case law.").

Given the interplay of the antitrust and intellectual property laws discussed above, Kodak's contention that its refusal to sell its parts to ISOs was based on its reluctance to sell its patented or copyrighted parts was a presumptively legitimate business justification. *See Data General,* 36 F.3d. at 1187. Kodak may assert that its desire to profit from its intellectual property rights justifies its conduct, and the jury should presume that this justification is legitimately procompetitive.

Nonetheless, this presumption is rebuttable. *See id.* at 1188. In *Data General,* the First Circuit reasoned that the plaintiff did not rebut the presumption by drawing an analogy to *Aspen Skiing,* where a monopolist made an important change·in a its practices, which had both originated in a competitive market and persisted for several years. *See Data General,* 36 F.3d at 1188. Because competitive conditions had never prevailed in the service market, the First Circuit concluded that it would be inappropriate to infer "from [defendant's] change of heart that its former policies 'satisfy consumer demand in free competitive markets.'" *Id.* at 1188 (quoting *Aspen Skiing,* 472 U.S. at 603, 105 S.Ct. at 2858). As in *Data General,* we are not faced here with a simple comparison between the monopolist's market and the established competitive market found in *Aspen Skiing.*

The *Data General* court noted that the presumption of legitimacy can be rebutted by evidence that the monopolist acquired the protection of the intellectual property laws in an unlawful manner. *See* 36 F.3d at 1188 (citation omitted). The presumption may also be rebutted by evidence of pretext. Neither the aims of intellectual property law,

nor the antitrust laws justify allowing a monopolist to rely upon a pretextual business justification to mask anticompetitive conduct. *See Kodak,* 504 U.S. at 484, 112 S.Ct. at 2091 (Because "Kodak's willingness to allow self-service casts doubt on its quality claim .... a reasonable trier of fact could conclude that [this justification] is pretextual.") (citation omitted).

Kodak defends its intellectual property rights "justification" against claims of pretext. Kodak argues that its subjective motivation is irrelevant. Kodak also contends, citing *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 379 (7th Cir.), *reh'g denied,* (7th Cir.1986), that a desire to best the competition does not prove pretext, nor does hostility to competitors. Kodak's argument and its accompanying authority stands for nothing more than the proposition that a desire to compete does not demonstrate pretext. ·

Evidence regarding the state of mind of Kodak employees may show pretext, when such evidence suggests that the proffered business justification played no part in the decision to act. Kodak's parts manager testified that patents "did not cross [his] mind" at the time Kodak began the parts policy. Further, no distinction was made by Kodak between "proprietary" parts covered by tooling or engineering clauses and patented or copyrighted products. In denying Kodak's motion for a new trial, the district court commented that Kodak was not actually motivated by protecting its intellectual property rights. Kodak argues that the district court should have allowed the jury to reach this conclusion.

Kodak photocopy and micrographics equipment requires thousands of parts, of which only 65 were patented. Unlike the other cases involving refusals to license patents, this case concerns a blanket refusal that included protected and unprotected products. *Cf. Westinghouse,* 648 F.2d at 647 (refusal to license patents); *SCM Corp.,* 645 F.2d at 1197 (same); *Miller Insituform,* 830 F.2d at 607 (claim based on termination of license agreement). From this evidence, it is more probable than not that the jury would have found Kodak's presumptively valid business

justification rebutted on the grounds of pretext.[12]

Kodak argues that the existence of some patented and copyrighted products undermines ISOs "all parts" theory. To the contrary, as discussed above, the "all parts" market reflects the "commercial realities" of the marketplace and the lack of identifiable separate markets for individual parts. The fact that Kodak did not differentiate between patented and nonpatented parts lends further support to the existence of these commercial realities. The jury accepted the "all parts" theory and found a scheme to monopolize the service market through Kodak's conduct. We hold that the district court's failure to instruct on Kodak's intellectual property rights was harmless.

## IV

■■■ Kodak asserts that the district court erred in failing to excuse Juror John Bushong on the grounds of bias. We recognize the district court's broad discretion on matters concerning juror bias and review such challenges for an abuse of discretion. *Hard v. Burlington Northern R.R. Co.*, 870 F.2d 1454, 1460 (9th Cir.1989).

Kodak's complaint revolves around Bushong's prior relationship with Kodak. At voir dire, Bushong disclosed that he had dealt with Kodak previously in conjunction with a photo laboratory he owned from 1979 to 1987. Kodak's counsel questioned Bushong as to how this prior experience might influence his objectivity. Bushong responded that he could put aside his personal opinions and base a verdict on the evidence in an impartial and fair manner. Neither party moved to strike Bushong from the jury panel and he was subsequently seated on the jury.

On the second day of trial Bushong sent a note to the judge expressing concern over his ability to remain impartial given his prior dealings with Kodak. Bushong wrote that he was "having difficulty not remembering [his] sometimes adversarial relationship with Ko-

dak." The note continued: "I don't know if this will effect me in my decision on the case. But could you please advise me how you feel about this." The judge had Bushong brought into open court, alone, for questioning by the court and counsel. Further inquiry revealed Bushong's feelings of resentment toward Kodak stemming from Kodak's handling of his prior account. Bushong indicated that he was struggling to remain impartial. Kodak then moved to strike Bushong for cause. The court decided to allow Bushong to remain on the jury subject to questioning two days later. The judge indicated that if Bushong harbored any conflict at the second hearing, Bushong would be removed.

At the second hearing, Bushong assured the court of his impartiality and confirmed his ability to judge the case fairly. He stated:

I can tell you that I've always prided myself in being a just and fair person and being observant of the facts. And that I think that in this case I can judge by the facts as presented and will give the facts a chance to speak for themselves.

Bushong also indicated that his negative memories of Kodak were "not coming back stronger. They are actually subsiding." Consequently, the judge denied Kodak's motion to dismiss Bushong for cause.

■■■ Kodak can only succeed on a challenge for cause by showing that Bushong was actually biased. *Ward v. United States*, 694 F.2d 654, 665 (11th Cir.1983). Actual bias involves an inability to act impartially or a refusal to weigh the evidence properly. *Id.* A juror's initial impressions or initial bias may be irrelevant, at the trial judge's discretion, when that juror commits to lay aside those feelings and reach a verdict based on the evidence presented and the court's instructions. *See United States v. Claiborne*, 765 F.2d 784, 800 (9th Cir.1985), *abrogated on other grounds, Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). The trial judge, who observes the

---

12. In Jury Instruction No. 34, the jury was instructed that, if they "find that any Kodak business reason" is a legitimate business reason, in that it "furthers competition on the merits, reduces prices, enhances the quality or attractive-

ness of a product, increases efficiency by reducing costs or otherwise benefits consumers," they "should then consider whether each such reason is pretextual-in other words, not a genuine reason for Kodak's conduct."

demeanor and credibility of a juror, is best suited to determine a juror's impartiality. *See Thompson v. Keohane,* ——— U.S. ———, ——————, 116 S.Ct. 457, 464–65, 133 L.Ed.2d 383 (1995).

The district judge determined that Juror Bushong was fit to serve on the jury. We see no reason to upset that determination or to disregard Mr. Bushong's oath to judge the evidence fairly and obey the court's instructions. *See United States v. Quintero-Barraza,* 78 F.3d 1344, 1350 (9th Cir.1995) (court "must pay due respect for the oath taken by [a juror] given the absence of any stated intention to disregard it."), *cert. denied,* ——— U.S. ———, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996).

Kodak argues that Bushong's initial bias takes on greater weight in light of the prolonged and contentious jury deliberations. Kodak cites the jurors' notes indicating "serious conflict," the district court's *Allen* charge and dismissal of a juror, as well as the need for supplemental instructions. Whether these irregularities were the consequence of the quantity and complexity of the evidence or otherwise, we need not decide; these factors are not relevant to our review of the district court's denial of Kodak's motion to exclude Juror Bushong. The district judge did not abuse his discretion in denying Kodak's motion, and the failure to dismiss Bushong did not deprive Kodak of a fair trial.

## V

■ Kodak next attacks both the jury's award of service damages and used equipment damages. We review a jury's verdict for substantial evidence. *Davis,* 927 F.2d at 1486. In the context of antitrust violations that standard is relaxed once liability is shown because market uncertainties often preclude a precise showing of "where" the plaintiff would have been absent the proven antitrust violation. *See Hasbrouck v. Texaco, Inc.,* 842 F.2d 1034, 1044 (9th Cir.1987) (citation omitted), *aff'd,* 496 U.S. 543, 572–73, 110 S.Ct. 2535, 2551–52, 110 L.Ed.2d 492 (1990). We allow juries to rely on probable and inferential proof, and to approximate damages. *See J. Truett Payne Co. v. Chrys-*

*ler Motors Corp.,* 451 U.S. 557, 565–66, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *Dolphin Tours, Inc. v. Pacifico Creative Service,* 773 F.2d 1506, 1511 (9th Cir.1985).

The ISOs employed a "yardstick" methodology in calculating damages. That is, the ISOs calculated damages by comparing their business to a comparable business not affected by the anticompetitive conduct at issue. *Id.* ("In economic terms, the amount of damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."). Whether that "unaffected" business properly compares to the relevant market presents a question of fact for the jury. *Syufy Enterprises v. American Multicinema, Inc.,* 793 F.2d 990, 1003 (9th Cir.1986).

### A. Service Damages

■ The ISOs' damage expert employed two basic yardsticks in determining damages: "1) plaintiffs' own non-Kodak revenues, and 2) the composite growth of other plaintiff ISOs' non-Kodak revenue." The ISOs' expert, Thomas Neches, found that ten of the eleven plaintiffs had sufficient non-Kodak revenues to justify using the first yardstick. Seven ISOs had insufficient non-Kodak revenues, so Neches calculated damages by comparing ISO's growth to the averaged annual composite growth of the other ISOs' non-Kodak revenues, the second yardstick. Neches used other methods in determining damages for plaintiffs MSI, CPO and ITS. Neches based MSI's lost profits on the statements of MSI's president to the effect that MSI would have earned 50% more "but for" the Kodak parts policy. For CPO and ITS copier service, Neches derived his damage estimates using an averaged growth rate of the ISOs servicing micrographic equipment. Kodak now challenges both the MSI and CPO estimates.

Kodak, citing *Gray v. Shell Oil Co.,* 469 F.2d 742 (9th Cir.1972), argues that the testimony of MSI's president provides insufficient support for the MSI yardstick. In *Gray,* we noted:

[plaintiff's] opinion, based on his hindsight, that he would have been able to make a greater margin of profit . . . is pure guess work and without foundation in this record.

*Id.* at 748. The record supports MSI's damage estimates. The record shows that MSI's lost profits were caused by its inability to obtain sufficient parts to compete for Kodak's large contracts. Further, MSI's president explained how he and his employees arrived at the 50% estimate, amounting to an extra $20,000 in service sales per year in each of MSI's twenty metropolitan areas.

Kodak argues that Neches used MSI's 50% figure "without further inquiry." To the contrary, Neches testified that he conducted additional analysis to verify that the 50% figure was a "reasonable projection;" he concluded "it was." Neches also prepared a market share study to verify that a sufficient number of machines were available to support MSI's claimed market share increase. This evidence sufficiently supports Neches' damage estimates.

◼ As to CPO and ITS, Kodak challenges the benchmark used for their damage claims: the average growth rate of the micrographic services of the other ISOs. Neches used this method because ITS had no copier service other than Kodak and although CPO serviced Xerox machines, Xerox adopted a parts policy similar to that of Kodak. Neches used the ISOs as his comparable market, and Kodak fails to identify any record evidence demonstrating that the markets used were not comparable. If there were "no meaningful economic similarity" between the ISOs and the firms used for comparison, we would have cause to overturn the damages. *See William Inglis & Sons v. Continental Baking,* 942 F.2d 1332, 1341 (9th Cir.1991), *vacated in part on other grounds,* 981 F.2d 1023 (9th Cir.1992). There is such a similarity here. We hold that substantial evidence supports the jury's finding.

◼ Kodak next focuses on the incongruity between the damages awarded to the larger ISOs (MSI and CPO) and the smaller ISOs. Kodak highlights the distinction between the two groups: the larger ISOs had access to parts and profited, while the smaller ISOs often gave up the search for parts. That the larger ISOs earned profits, however, does not preclude them from recovering damages to compensate any losses stemming from Kodak's anticompetitive behavior. Juries may award damages to profitable businesses for lost sales as the result of anticompetitive behavior. *See Great Western Directories, Inc. v. Southwestern Bell Telephone Co.,* 63 F.3d 1378, 1387–88 (5th Cir. 1995), *superseded in part on other grounds,* 74 F.3d 613, *cert. dismissed,* —— U.S. ——, 117 S.Ct. 26, 135 L.Ed.2d 1120 (1996); *see also Pierce v. Ramsey Winch Co.,* 753 F.2d 416, 436–37 (5th Cir.1985) (plaintiff can establish antitrust injury by showing that it would have earned an even higher profit but for antitrust injury). MSI and CPO, though profitable, showed that Kodak's parts policy handicapped their growth.

◼ Kodak also claims that it was not responsible for the losses of ASI, which went out of business, as those losses resulted from ASI's inability to adapt to Kodak's conduct. ASI's president admitted that he simply stopped trying to obtain parts and let his contracts expire after Kodak instituted its parts policy. The fact that other ISOs took ASI's customers and profited shows that ASI's exit was caused by factors other than Kodak's conduct. *See Datagate, Inc. v. Hewlett–Packard Co.,* 941 F.2d 864, 868 (9th Cir. 1991) (no antitrust injury where exiting ISO lost its customers to an entering ISO). Accordingly, substantial evidence does not support ASI's damage award, and we reverse as to those damages.

◼ Kodak next argues that the ISOs' damage study failed to properly consider later changes in the ISOs' claims. First, Kodak cites testimony by principals of various ISOs establishing the availability of parts for pre–1986 micrographics equipment. Yet, Kodak argues, Neches testified that he built the damage study on the assumption that the micrographics plaintiffs "were claiming damages on both pre–1986 and post–1986 equipment." Nonetheless the damages estimates remain valid, because, as Neches explained, the pre and post–1986 distinction made no difference in his projections:

The way that my study was done, I don't look at specific equipment, specific parts, specific customers. I look at the overall trend of the sales.

If [plaintiffs] were selling pre-'86 equipment or able to service some post-'86 equipment, that would show up in their actual sales and would act as a reduction to damages.

Neches calculated lost revenues by subtracting Kodak revenues from non-Kodak revenues (the yardstick) and multiplying by marginal profit rates.[13] This method accounted for revenues actually earned from pre–1986 Kodak equipment, but the damage awards did not include lost profits from service of pre–1986 equipment for these ISOs.

Kodak argues that the damage study failed to account for the fact that the ISOs did not compete with Kodak for the point-of-sale contracts entered into between equipment sellers and purchasers. Kodak does not point to evidence in the record, however, establishing that the ISOs' non-Kodak revenue derived from such contracts. Absent this evidence, Kodak does not demonstrate that the comparative use of non-Kodak revenue as a yardstick is inaccurate.[14]

Kodak also argues that the ISOs' failure to alter the damage study after the withdrawal of the ISOs' tying and conspiracy claims invalidates the study. In the conspiracy and tying claims the ISOs alleged a different legal theory for the same harm that the jury found at trial: exclusionary conduct leading to the monopolization of the service market. The jury found that Kodak's conduct deprived the ISOs of service contracts they would otherwise have obtained. That Kodak accomplished this through its parts policy and restrictions on original-equipment manufacturers and not through overt tying or conspiracy does not affect the total damages. Section 4 of the Clayton Act provides for damages upon a showing of antitrust injury.

15 U.S.C. § 15; *Datagate*, 941 F.2d at 868 (citations omitted).

Kodak argues that the ISOs' damages do not comport with the impact of a hypothetical open sale policy on parts. Neches agreed that if Kodak increases its parts prices, the ISOs' service profits would decrease in the "but for" world without Kodak parts policy. These changes could decrease the ISOs' profit margins. For most ISOs, however, the jury was asked to compare revenues from service on equipment brands not restricted by a parts policy.[15] These competitive markets would reflect new entry, parts price increases and optimal service prices.

We uphold these damages and all service damages with the exception of those damages awarded to ASI.

### B. Used Equipment Damages

 Kodak challenges the jury's damage award, to six ISOs, for reduced sales of refurbished Kodak equipment. The district court previously dismissed the ISOs' used equipment monopoly claims "on the merits." The court nonetheless gave Jury Instruction No. 52, submitted by Kodak, which allowed the jury to award damages for lost equipment sales "caused by some of the consequences flowing from the monopolization of the service market."

Kodak now argues that the used equipment damage award was improper because Neches did not distinguish between equipment sales lost due to Kodak's control over the parts market and equipment sales lost due to Kodak's service monopoly. In denying Kodak's motion for judgment as a matter of law, the district court relied on *Litton Systems, Inc. v. AT & T Co.*, 700 F.2d 785 (2d Cir.1983), and concluded that the jury "had an evidentiary basis for finding that . . . ISOs would not only be able to get parts to *service* used equipment, but also to refurbish

---

**13.** Kodak does not point to evidence showing that MSI's president based his 50% earnings growth estimate on pre–1986 equipment.

**14.** Although Neches' calculation of the equipment available to service in different markets might have been skewed by failing to take equipment under point-of-sale contracts into account,

certain exhibits show that these contracts were taken into account in his market calculation.

**15.** MSI's president factored in a 20% "attrition rate" in order to account for new competition. MSI's projected growth rate for the relevant period was less than the other ISOs.

used equipment." We review Kodak's motion for judgment as a matter of law de novo. *Bank of the West v. Valley Nat'l Bank of Arizona,* 41 F.3d 471, 477 (9th Cir.1994).

In *Litton,* the Second Circuit upheld a damage award despite the fact that the plaintiff's damages study failed to differentiate between lawful and unlawful practices. 700 F.2d at 825. The Second Circuit indicated that, contrary to the defendant's argument, the study did not assume the absence of certain practices not proven at trial. *Id., Litton* did not address the issue presented here: the disaggregation of damages attributable to different acts and suffered in different markets.

The ISOs must segregate damages attributable to lawful competition from damages attributable to Kodak's monopolizing conduct. *Vernon v. Southern Cal. Edison Co.,* 955 F.2d 1361, 1372 (9th Cir.1992) (citing *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1161 (7th Cir.1983)). A failure to do so contravenes the command of the Clayton Act. Although the district court instructed the jury to award only those damages arising from Kodak's monopolization of the service market, the ISOs point to no basis in the record for quantifying lost sales of used equipment caused by Kodak's service monopoly. The ISOs' evidence consists only of complaints by individual ISO owners that they could not sell used equipment because they could not find anyone to service that equipment besides Kodak, who effectively refused. Kodak's used equipment service policy could not properly be presented to the jury as an anticompetitive practice given the district court dismissed the ISOs' used equipment monopolization claim.

The ISOs counter that they explained the causation issue to the jury, which did not award all the damages requested. Nonetheless, any damages awarded were speculative. Maintaining that all damages were caused by Kodak's anticompetitive conduct, the ISOs argue that disaggregation is required only

where some damage has been caused by lawful activity. This argument renders the distinction between conduct not adjudicated unlawful and "purely lawful competitive action" illusory.[16] In the context of a § 2 monopolization claim, conduct is unlawful because of its anticompetitive effects on the relevant market. Yet conduct found anticompetitive in one market may not be anticompetitive in another market.

When a § 2 monopolization claim has been dismissed or adjudicated against a plaintiff, damages attributable to that claim must be disaggregated. *See id.* at 1371–72 (citing *MCI,* 708 F.2d at 1161–63). In *MCI Communications Corp. v. AT & T,* for example, the damage study employed assumed twenty-two unlawful acts, yet the jury found liability on a substantially lower number of violations. 708 F.2d at 1163. The Seventh Circuit reversed and remanded for a new trial on damages, holding:

> [MCI's damage] study does not contain any information indicating how to adjust MCI's projected revenues and profits to reflect a possible finding that [some items] were lawfully priced.

*Id.* Faced with the same difficulty, we also remand for a new trial on used equipment damages.

## VI

▮▮▮▮ Last, Kodak challenges the district court's ten year permanent injunction requiring Kodak to sell all parts to all ISOs at reasonable prices.[17] We review the district court's grant of permanent injunctive relief for an abuse of discretion or application of erroneous legal principles. *Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir.1992). Appellate courts often defer to trial courts on issues involving the "framing" of injunctions. Appellate courts will modify injunctions, however, when such action is "necessary to assure that the relief will be effective." *United States v. Glaxo Group Ltd.,* 410 U.S. 52, 64,

---

**16.** The ISOs' argument that they were entitled to recover damages under a more general "proximate cause" instruction also founders on this untenable distinction.

**17.** Counsel informed this court, by letter dated February 24, 1997, of an amendment to the district court's injunction. We recommend that the district court review that amendment in light of the modifying language set forth below.

93 S.Ct. 861, 868, 35 L.Ed.2d 104 (1973) (internal quotation and citation omitted).

Kodak attacks the injunction on the grounds that requiring Kodak to inventory parts for the ISOs promotes free-riding by the ISOs. In *Kodak*, the Supreme Court noted that for Kodak to have an objection based upon free-riding, "the [ISOs] would have to be relying on Kodak's investment in the service market...." 504 U.S. at 485 n. 33, 112 S.Ct. at 2092 n. 33; *see, e.g., Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("If [the plaintiff] wants to ensure emergency access to a supply of parts, it may do so by maintaining its own stockpile rather than 'free riding' on the inventory costs incurred by [the defendant]."). Kodak's costs for maintaining an inventory of original-equipment manufacturer produced parts constitute a portion of its investment in the service market and thus the ISOs are free-riding.

Further, the injunction requires Kodak to sell all parts for Kodak equipment, whether or not Kodak manufactures those parts, and forbids Kodak from interfering with sales to ISOs by original-equipment manufacturers.[18] Through these two provisions, the injunction allows the ISOs to choose between purchasing from Kodak, which must warehouse parts, or from individual suppliers. Because the ISOs have an alternative source for these parts, the "no interference with [original-equipment manufacturers]" requirement is unnecessary and anticompetitive. It promotes free-riding by requiring Kodak to pay for keeping a massive inventory of parts for the ISOs. This "all parts" requirement creates barriers for non-Kodak original-equipment manufacturers by requiring them to price replacement parts at levels necessary to attract ISOs away from Kodak's parts counter. It also unnecessarily entrenches Kodak as the only parts supplier to ISOs. Consequently, we direct the injunction to require Kodak to sell only Kodak-manufactured parts. In order to avoid confusion

over combinations of parts made from some elements manufactured by Kodak and some by original-equipment manufacturers, we require that "Kodak parts" include any "subassemblies, [etc.]" as specified in the injunction.

Next, Kodak contends that the injunction imposes utility-like regulation of prices and deprives Kodak of its right to earn monopoly profits on its patented and copyrighted products. This requirement involves the court in a matter generally considered beyond our function, namely, direct price administration. *See Concord v. Boston Edison Co.*, 915 F.2d 17, 25 (1st Cir.1990) (citations omitted). The district court observed that Kodak "erroneously assumes that it is still entitled to charge monopolistic prices." In fact, Kodak is entitled to monopoly prices on its patented and copyrighted parts, as the ISOs admit. The cases cited by the district court involve forced sales at reasonable prices where the defendant has restrained trade in the market for patented goods. *See, e.g., Glaxo Group*, 410 U.S. at 62, 93 S.Ct. at 867 (defendant required to sell bulk chemical controlled by illegal patent pooling). Kodak used its monopoly on parts, including patented and copyrighted products, to monopolize the service market. If future harm may be prevented without eroding the value of Kodak's intellectual property rights, less restrictive means need be pursued. Protecting Kodak's intellectual property rights takes on special significance where the injunction requires reasonable prices for the sale or licensing of parts for all new Kodak equipment introduced during the injunction's ten year period. This requirement substantially lowers Kodak's incentive to create new products.

Dropping the reasonableness element and requiring nondiscriminatory pricing will both end Kodak's service monopoly and protect Kodak's intellectual property rights. Kodak should be permitted to charge all of its customers, including end users (both self-servicers and those under service contracts with Kodak),[19] service companies contracting with

18. The injunction limits this requirement where "the ISOs or vendors are ... causing the breach of any obligation of themselves or a third party not to disclose proprietary Kodak data ... provided that the sale of a part ... shall not be

deemed to be a disclosure of Kodak proprietary data." The net effect is to require the sale of parts.

19. Forcing nondiscriminatory pricing will force Kodak to restructure its pricing policies, but this

Kodak and ISOs, any nondiscriminatory price that the market will bear.[20] We direct the district court to modify the injunction by deleting the requirement that prices "in any event, be reasonable."

Kodak's remaining challenges to the injunction are without merit. Injunctive relief covering nonparty ISOs is proper under these circumstances. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261, 92 S.Ct. 885, 890–91, 31 L.Ed.2d 184 (1971) ("While ... any individual threatened with injury by an antitrust violation may ... sue for injunctive relief ... one injunction is as effective as 100."); *Bresgal v. Brock*, 843 F.2d 1163, 1170–72 (9th Cir.1987) (relief in favor of nonparties appropriate where same defendant enjoined and where broad scope is necessary to give prevailing parties relief). Relief in favor of all ISOs prevents entrenching the ISOs as service or parts oligopolists. Likewise, the district court had ample authority for ordering forced sale or licensing of patented or copyrighted products. *See Glaxo Group*, 410 U.S. at 62, 93 S.Ct. at 867.

We direct the following modifications to the injunction:

### 1. DEFINITION OF TERMS

*As used in this permanent injunction, the following terms shall have the following meanings:*

*(a)"Kodak" shall mean the defendant Eastman Kodak Company, its officers, agents, servants, employees, attorneys and all persons in active concert or participation with any of them who receive notice of this injunction* [**, and Kodak's successors and assigns**].

(b)"Kodak equipment" shall refer to all past, present and future micrographic equipment (whether film or digitized media based) made by or for defendant and to all Kodak high volume photocopiers made by or for defendant Kodak including, without

limitation, all such equipment serviced by Kodak personnel in the field.

(c)"ISOs" shall refer to any person, firm, corporation or other entity engaged, in whole or in part, in providing equipment on site or field repair or maintenance service to end user customers possessing Kodak micrographic equipment or Kodak high volume photocopiers in the United States.

(d)"Parts" includes the following:

(i) parts for Kodak equipment;

(ii) parts identified or described in Kodak's Parts Lists;

(iii) all parts or supply items that are field replaceable by Kodak technicians (including, without limitation, subassemblies—to the extent that subassemblies are available to Kodak technicians—circuit board level parts, IC chips, image loops, pm packs, filters and cleaning kits);

(iv) service manuals (including those incorporated in hard copy, microfiche or other medium), parts, lists, price lists; and

(v) all tools or devices essential to servicing Kodak equipment including, but not limited to, service modules, meters and electrometers, but excluding tools and devices which are generally available from normal commercial sources and which are not distributed by Kodak to its technicians.

*(e)"Kodak parts" include any part assembled, prepared or manufactured by Kodak. Kodak parts shall not include parts manufactured by original-equipment manufacturers for Kodak.*

### 2. SALE OR PARTS FOR HIGH VOLUME COPIERS AND MICROGRAPHIC EQUIPMENT BY KODAK

(a) Kodak shall sell **Kodak** parts to ISOs or any buying cooperatives acting on

---

result is less onerous than direct price regulation.

**20.** The district court observed that the prices Kodak charges to companies like Danka and Canon, which have entered into servicing con-

tracts with Kodak, provide a basis for assessing the reasonableness of Kodak prices. When the ISOs expand their markets, however, the demand for Kodak parts will increase, and Kodak should not be limited to its current prices.

behalf of ISOs for all models of Kodak equipment for which Kodak or its authorized agents offer service, provided that Kodak reserves the right to require cash on delivery for new sales to any person without an established and reasonably acceptable credit history or who is in default of an obligation to pay Kodak for previous orders or to take other reasonable actions related to credit if applied to ISOs and other third parties in a nondiscriminatory manner.

(b) All orders for **Kodak** parts by ISOs shall be made through the Kodak Customer Parts and Product Support Center (or similar facility) currently located in Rochester, New York.

(c) To the extent Kodak offers to its own technicians, for their use in repairing and maintaining Kodak equipment, individual **Kodak** parts as well as subassemblies containing numerous **Kodak** parts, or to the extent it is reasonable to do so, Kodak will offer to sell to any interested party on **[reasonable and]** nondiscriminatory terms and prices such individual parts and subassemblies, even though doing so gives the prospective purchaser the option of obtaining a particular part by itself or as a component of a subassembly.

(d) The provisions of this Injunction apply to equipment models which Kodak will introduce during the term of this Injunction as well as to the equipment models which Kodak has already introduced.

(e)"Sell" as used in paragraph 2(a), above, includes, at Kodak's option, "license" with respect to any copyrighted "parts," on **[reasonable and]** nondiscriminatory terms.

### 3. ISO ACCESS TO THIRD PARTY SOURCES OF PARTS

(a) Kodak shall not interfere with the ISOs' purchase of parts from third party vendors (including the purchase of parts from Kodak parts suppliers), so long as the ISOs or vendors are not causing the breach of any obligation of themselves or a third party not to disclose proprietary Kodak data, specifications, drawings and/or schematic diagrams; provided that the sale of a part by a third party vendor or Kodak part supplier shall not be deemed to be a disclosure of Kodak proprietary data.

### 4. NO DISCRIMINATION AGAINST ISOs

(a) Kodak shall not discriminate against any ISO regarding parts availability or prices vis-a-vis any other ISOs, or any other commercial service provider **or end user** (*i.e.*, Kodak will sell parts to any ISO at the same prices and terms, conditions and delivery schedules offered to any other ISO commercial service provider **or end user**) **[which prices, terms and conditions shall, in any event, be reasonable]**.

(b) Kodak shall not discriminate against any customer or other party on the basis that such customer or other party has used the parts or services of someone other than Kodak in connection with Kodak equipment; provided, however, that nothing in this order shall prohibit Kodak from charging a reasonable fee to inspect Kodak equipment before agreeing to offer an equipment maintenance agreement for service of that Kodak equipment.

### 5. KODAK'S RETENTION OF PROPRIETARY RIGHTS

Nothing in this Injunction shall prevent Kodak from taking appropriate legal steps to prevent others from duplicating parts for Kodak equipment in which Kodak has a protectable intellectual property interest.

### 6. NOTICE OF INJUNCTION

Kodak shall, within 45 days of the entry of this injunction, send to its past (within past five years) and current micrographic equipment and high volume photocopiers service customers a notification advising them that Kodak has been ordered to sell Kodak parts to ISOs for the repair and maintenance of Kodak equipment, in a form agreeable to plaintiffs or as approved by the court.

### 7. TERM OF INJUNCTION

Absent further order of this Court for good cause shown, this Injunction shall

expire ten (10) years from the date of its entry. *If Kodak completely exits the service market for either (1) high volume copiers or (2) micrographic equipment, the terms of this injunction shall no longer apply to Kodak parts for that equipment.*

### 8. RETENTION OF JURISDICTION

This Court retains jurisdiction of this matter for the purpose of enabling any party to apply for such further orders and directions as may be necessary or appropriate for the construction, modification or termination of any of the provisions herein, or for enforcement and compliance with its terms or for the punishment of violations.

### VII

We AFFIRM as to all liability issues; REVERSE all damages awarded to ASI and those damages awarded for lost sales of used equipment and REMAND for a new trial on used equipment damages. We AFFIRM on the remaining damage awards and AFFIRM the injunction as modified. Additionally, we award partial attorney's fees for the ISOs to be determined by the district court.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

. GILLMOR, District Court Judge, concurring in part and dissenting in part:

I join in the majority opinion affirming in part, reversing in part and remanding for further proceedings, with the exception of two modifications to the permanent injunction of the district court. Both modifications concern the applicability of the injunction to Kodak's successors. The first is the deletion of the provision in paragraph 1(a) of the injunction specifying that the injunction applies to "Kodak's successors and assigns." The second modification with which I do not agree is the addition to paragraph 7 of the injunction of the following provision: "If Kodak completely exits the service market for either (1) high volume copiers or (2) micrographic equipment, the terms of this injunction shall no longer apply to Kodak parts for that equipment." I believe that these modifi-

cations are unnecessary and significantly reduce the effectiveness of the injunction.

### I

The appellate court reviews a district court's decision to grant permanent injunctive relief and the scope of that relief for an abuse of discretion or application of erroneous legal principles. *Viceroy Gold Corp. v. Aubry,* 75 F.3d 482, 488 (9th Cir.1996); *Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir. 1992). Appellate courts may also modify the scope of an injunction when such action is "necessary to assure that the relief will be effective." *United States v. Glaxo Group, Ltd.,* 410 U.S. 52, 64, 93 S.Ct. 861, 868, 35 L.Ed.2d 104 (1973). Applying these standards, I do not believe the majority's modifications are necessary or appropriate. The district court's decision to provide for application of the injunction to Kodak's successors and assigns was amply supported by law and by the facts of this case and was not an abuse of discretion. Moreover, I believe that the majority's modifications decrease, rather than assure, the effectiveness of the injunction.

The injunction in this case should apply to Kodak's successors and assigns. The application of an injunction need not be strictly limited to parties before the Court and may extend to the successors and assigns of a party. Federal Rule of Civil Procedure 65(d) provides that an injunction is "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." Fed.R.Civ.P. 65(d). Applying this Rule, both the Supreme Court and the Ninth Circuit have upheld injunctions that apply to the "successors and assigns" of named defendants. *See Golden State Bottling Co., Inc. v. National Labor Relations Board,* 414 U.S. 168, 177–80, 94 S.Ct. 414, 421–23, 38 L.Ed.2d 388 (1973); *Regal Knitwear Co. v. National Labor Relations Board,* 324 U.S. 9, 13–16, 65 S.Ct. 478, 481–82, 89 L.Ed. 661 (1945); *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1298 (9th Cir.1992). The Supreme Court has recog-

nized that a successor of a party may be in privity with that party for purposes of Rule 65(d). *Golden State Bottling*, 414 U.S. at 179, 94 S.Ct. at 422–23. The district court had authority to enjoin Kodak's successors and assigns from continuing Kodak's violations of the antitrust laws.

A provision extending application of an injunction to the successors and assigns of a named party is often essential to the effectiveness of the injunction. As was noted in Gallo, without such a provision, "the injunction theoretically might be defeated by assignment; at the very least an avenue for further litigation would be left open." *Gallo*, 967 F.2d at 1298. If an injunction does not apply to the defendant's successors, the defendant could nullify the injunction by assigning a portion of its business operations to a third party, which would then be free to resume the enjoined activity. Even where assignment is not the product of intentional collaboration by the defendant and the assignee to avoid the impact of the injunction, assignment permits the assignee to resume the enjoined conduct and forces the plaintiff to return to court to seek a new injunction against the assignee.[1]

For these reasons, I believe that the district court's decision to provide for application of the injunction to Kodak's successors and assigns was appropriate and necessary to ensure the effectiveness of the injunction.

## II

The majority's modifications to paragraphs 1 and 7 of the injunction fundamentally alter the scope of the injunction. The removal of the provision applying the injunction to "Kodak's successors and assigns" enables Kodak to deprive the ISOs of the relief embodied in the injunction by assigning a portion of its operations to a third party. If this were the only modification, it would still be theoretically possible for the ISOs to seek to hold a particular successor to the terms of the in-

junction. Because the injunction still applies to "all persons in active concert or participation with" Kodak, the ISOs could seek to bind a particular successor to the injunction by seeking to prove collaboration between Kodak and the successor.

The modification to paragraph 7 of the injunction eliminates this possibility. This modification provides that, upon Kodak's exit from the copier service market, all provisions of the injunction relating to copier parts will terminate. The provisions of the injunction pertaining to copier parts will be eliminated and will no longer apply to anyone: Kodak, Kodak's successors, or those in "active concert or participation" with Kodak. Even assuming that it was necessary to narrow the class of persons bound by the injunction, I see no basis for eliminating key provisions of the injunction altogether.

I do not believe that such fundamental alterations to the injunction are necessary or appropriate. The application of the injunction to Kodak's successors is supported by law and is not based on the application of erroneous legal principles. Binding Kodak's successors to the injunction is necessary to ensure that the ISOs are not deprived of effective injunctive relief. The majority opinion does not state any reason for altering this aspect of the injunction. Moreover, the parties have not objected on appeal to the application of the injunction to Kodak's successors. In these circumstances, I cannot conclude that the district court abused its discretion by framing the injunction as it did.

Although an appellate court may modify an injunction when such action is "necessary to assure that the relief will be effective," *see Glaxo*, 410 U.S. at 64, 93 S.Ct. at 868, it appears that the majority's modifications will drastically reduce the effectiveness of the injunction. The Supreme Court noted in *Glaxo* that the "purpose of relief in an antitrust case is 'so far as practicable, [to] cure

---

1. The facts of the instant case illustrate this problem. On February 12, 1997, after oral argument in this case, the parties and Danka Office Imaging Company ("Danka") filed in the district court a stipulation stating that Kodak has sold its copier sales and service division to Danka. Pursuant to the stipulation of the parties and of Danka, the district court entered an order stating that Danka agreed to be bound by the terms of the injunction. Because the majority eliminates the provisions applying the injunction to Kodak's successors, the sale to Danka will deprive the ISOs of an important portion of the relief they have obtained.

the ill effects of the illegal conduct, and assure the public freedom from its continuance.'" *Id.* (quoting *United States v. United States Gypsum Co.*, 340 U.S. 76, 88, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950)). The majority's modifications contravene this purpose by eliminating crucial elements of the relief obtained by the ISOs and by eliminating the injunction's prohibition on a continuation of anticompetitive conduct.

The district court attempted to fashion an injunction that would provide effective relief for the ISOs and prevent the continuation of Kodak's anticompetitive policies. The two modifications addressed herein drastically reduce the effectiveness of the injunction. I would affirm the district court's decision to apply the injunction to Kodak's successors and assigns.